**VANGUARD SECURITY INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**and**

**Burns International Security Services, Intervenor–Defendant.**

**No. 90–202C.**

United States Claims Court.

April 4, 1990.

Paul F. McQuade, Washington, D.C., for plaintiff; Dale W. Church, Pillsbury, Madison & Sutro, of counsel.

John F. Edwards, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant; Katherine Schulze, Asst. Gen. Counsel, I.N.S., of counsel.

Daniel J. Donahue, Washington, D.C., for intervenor-defendant; Paul R. Pearson, Arthur and Speed, Ltd., of counsel.

## OPINION

NETTESHEIM, Judge.

This pre-award bid protest is before the court after argument on cross-motions for summary judgment. At issue is the propriety of the cancellation of a solicitation. A question for decision is whether the Government is bound to obtain the services for which it solicited from the lowest responsive bidder, despite a mistake that, in the Government's view, changed the type of contract covered by the solicitation. The overarching issue, however, is whether the Government can justify the cancellation based on major defects in the solicitation that were revealed only during litigation and that did not formerly play any role in the agency's decision to cancel the subject solicitation.

## FACTS

Plaintiff VanGuard Security Inc. ("plaintiff") brought suit pursuant to 28 U.S.C. § 1491(a)(3) (1982), to enjoin the cancellation of Solicitation No. IFB/DLS-2-90 ("DLS-2-90") by the Southern Regional Office of the Immigration and Naturalization Service (the "INS") of the U.S. Department of Justice for the INS Port Isabel Service Processing Center ("SPC"), Los Fresnos, Texas. The subject procurement covered provision of unarmed guard services for an initial year and four option years. Plaintiff had been the low responsive bidder of the six bids received prior to bid opening on December 18, 1989.

By letter dated February 13, 1990, Contracting Officer (Supervisory Contract Specialist) Arthur S. Cooper, III, of the INS Southern Regional (Dallas) Office, notified plaintiff that Amendment No. 3, issued on December 12, 1989, "contained several conflicting and fatal errors." According to the notice of cancellation, the amendment had the effect of changing the intended contract from an indefinite quantity contract to a firm fixed-price contract. Amendment

No. 3 also required bidders to price additional guard hours and stated that failure to provide a bid for all the items shall cause the bid to be rejected. The notice of cancellation explained that the second change suggested the use of options, which was an unacceptable method to the Southern Regional Office for obtaining the needed guard services. The notice recited:

> The errors included in Amendment # 3 resulted in ambiguous and conflicting specifications, with the issue of intended contract type outstanding. The original text of the solicitation including amendments # 1 and # 2, stated clearly, correctly, and appropriately that the intended contract was to be of the Indefinite Quantity type. The changes made by Amendment # 3 cast ambiguity with its apparent (yet incomplete and inappropriate) conversion of the solicitation to a "Firm Fixed Price" type of contract. At issue is the requirement for additional services which must be available to the government on short notice. In a firm fixed price type of contract, options may be used to provide for additional services beyond the basic contract requirements. However, the exercising of an "option" to obtain the additional services is not an acceptable method in that the action of exercising an option itself, is too awkward and time consuming to be considered.
>
> In consideration of the facts and analysis above, the Contracting Officer has found that the specifications and terms of Solicitation # IFB/DLS-2-90 with its amendments 1-3, contain fatal conflicts and ambiguities which would result in prejudice to offerors, and if the contract was to be awarded as is, such contract would not satisfy the needs of the government....

Contracting Officer Cooper advised that the Commissioner of the INS determined to reject all bids and cancel the solicitation.

The undisputed and material facts forming the background of this action follow. Although according to Ronald A. Schlesinger, an INS Procurement Analyst in the Headquarters, Contracting and Procurement Branch, the INS does not have a significant number of guard service contracts, the Southern Regional Office has procured guard services in the past for the Port Isabel SPC facility. Intervenor Burns International Security Services ("Burns") was the incumbent under an indefinite quantity contract awarded in November 1986. Burns' contract expired sometime in September 1989. Since that date, Burns has been providing guard services under purchase orders. Solicitation IFB/DLS-2-90 was issued on October 23, 1989, according to Contracting Officer Cooper. It contemplated an indefinite quantity contract, as did the predecessor of November 20, 1986, under which Burns provided guard services.

Solicitation DLS-2-90, as issued, called for a minimum of 175,200 productive guard man-hours and a minimum of 17,520 supervisory man-hours, if performance commenced on December 1, 1989. The solicitation required the contractor to staff 20 guard posts 24 hours per day, seven days a week, including holidays, in order to meet the specified minimum productive guard man-hours. The solicitation included four one-year option periods. Bidders on the solicitation were to provide unit prices and total bid prices for productive guard man-hours and supervisory guard man-hours for each contract period. The provision of temporary additional services was also required, not to exceed 120 man-hours per month—100 for production guards and 20 for supervisory.

Contract Specialist Thomas E. Jones, Mr. Cooper's subordinate, drafted the solicitation using the 1986 contract with Burns. Many of the pages of the solicitation package were copied directly from the Burns contract. In some instances provisions were lifted wholesale without revision to reflect the later date or requirements of solicitation DLS-2-90. Contracting Officer Cooper issued two amendments before the crucial Amendment No. 3. Amendment Nos. 1 and 2, issued on November 22, 1989, and December 6, 1989, respectively, extended the due date for the bids and gave a revised initial performance period. Since the solicitation was under review during

this interval, both advised that additional clarification would follow. On December 12, 1989, Amendment No. 3 issued extending the bid opening and due date to December 18, 1989, and setting initial performance to begin on February 12, 1990. Amendment No. 3 is a 20–page document that was issued under the authority of Contracting Officer Cooper.

The INS based its decision to cancel the solicitation on the effect of two modifications to the solicitation effected by Amendment No. 3. Although Contracting Officer Cooper did not prepare the bulk of this amendment, he personally drafted the two key provisions. By these amendments he intended to change the contract from an indefinite quantity contract to a firm fixed-price contract.

These modifications are described in the order of sequence in the solicitation (and not as they appear in the amendment). Prior to amendment Part I, Section F "Deliveries and Performance" provided, in pertinent part:

> A. PERIOD OF PERFORMANCE
>
> This is an indefinite quantity contract which provides for a minimum of *175,200* productive guard man-hours and a minimum of *17,520* supervisory man-hours if the contract is awarded so that performance begins at 12:01 AM on December 1[,] 1989. The contract period will be from date of award through 11:59 PM, September 30, 1990, with the possibility of continuing for four (4) one year option periods.
>
> ....
>
> Additional services over and above the awarded minimum man-hours may be ordered by INS not to exceed one-hundred (100) productive guard man-hours and twenty (20) supervisory man-hours per month. The Prices bid per hour are firm, fixed prices that will be used when paying for additional hours, when ordered.

(Emphasis in original.) Amendment No. 3 changed Part I, Section F, as follows:

> A. PERIOD OF PERFORMANCE
>
> This is a firm fixed price contract providing for a minimum of *116,160* productive guard man-hours and a minimum of *11,616* supervisory man-hours during the initial performance period of *February 12, 1990* through 11:59 PM, *September 30, 1990,* with the possibility of continuing for four (4) additional one year option periods....
>
> ....
>
> Additional services over and above the awarded minimum man hours may be ordered by INS not to exceed one-hundred (100) productive guard man-hours and twenty (20) supervisory man-hours per month. **The prices bid for these additional services are firm-fixed hourly rates. The contractor shall invoice for these additional services, and payment shall be effected, at the prices bid per hour, as ordered by the government, and performed.**

(Emphasis in original; bold denotes textual changes.)

Prior to amendment Part IV, "Representations and Instructions," Section M "Evaluation Factors for Award," C. "Evaluation of Bids and Award Criteria" provided:

> NOTE: Bidder must enter bid prices for the initial period (item I) and the first and second option years (Items II & III). Failure to complete Items I, II, & III will cause the bid to be rejected and declared non-responsive.

Amendment No. 3 revised this provision to read:

> NOTE: Bidder must enter bid prices for the initial period (item I) and for each of the four option years (Items II, III, IV, & V). **Bidders must also enter a price for the additional guard hours provided for by the contract. Failure to provide a bid for all items** cause [sic] the bid to be rejected and declared non-responsive.

(Bold denotes textual change.)

Six bids were received timely, two of which were rejected as nonresponsive. According to a document entitled "Findings and Determinations" prepared by INS procurement personnel in January 1990:

> [Plaintiff] was the apparent low (responsive) bidder, with a bid for the initial period of $1,352,959.82 and an overall total bid including four year options of

$9,570,872.13. The second lowest bidder was Burns International Security Services, Inc., for the initial period at $1,373,-872.13, with a total bid of $9,668,-612.64....

Solicitation DLS-2-90, as amended, required each bidder to submit unit prices and total amounts for the initial period and each of the four option periods for the following categories of service: "Minimum productive guard man-hours (116,160 hours), and Minimum supervisory guard man-hours (11,610 hours)." For guards plaintiff submitted a unit price of $10.48905 and for supervisors, $11.58930. Burns' prices, respectively, were $10.70 and $11.28. Bidders supplied prices on a preprinted pricing sheet provided in DLS-2-90. The continuation page of this pricing sheet contained five paragraphs of explanatory material relating to the information supplied by the INS on the preprinted pricing sheet. This continuation of the pricing sheet itself does not call for any input by a bidder. It will be recalled that Amendment No. 3 required: "Bidders must also enter a price for the additional hours provided for by the contract...." However, no corresponding pricing sheet was provided. Of the six bidders, only Burns provided pricing data for additional hours, and in a manner that could not indicate to what periods the prices applied. Burns quoted the same unit price for both guards and supervisors as Burns listed on the first page of the pricing sheet, *i.e.*, $10.70 and $11.28, respectively. Burns typed this additional information on the continuation page containing the five advisory paragraphs, opposite the second paragraph, which was unchanged by Amendment No. 3 and read:

> Additional services above the minimum stated herein, may be required on an as needed, as ordered basis during the life of this contract, not to exceed 120 man-hours per month. The unit price bid per hour is a firm fixed-price and will be used for payment of any additional services ordered.

It has been Burns' position before the INS Southern Regional Office and this court that plaintiff's bid was nonresponsive for failing to submit a separate quotation for the additional work.

Repeated communications to the same effect from Burns prompted the INS Southern Regional Office to seek advice of Mr. Schlesinger, the Headquarters Procurement Analyst. The narrow question originally framed by Contract Specialist Jones was the effect of the failure of vendors to price additional services in face of the requirement in Amendment No. 3 that they do so. Incident to their telephone conversation on January 4, 1990, Mr. Jones sent a facsimile of five pages to Mr. Schlesinger, including a copy of the original pricing sheet; that part of the Amendment No. 3 requiring the pricing of additional work; the continuation page of the pricing sheet as submitted by Burns, showing the quotation for additional work; and the bid abstract prepared by the Southern Regional Office. According to his declaration (which clarified somewhat inconsistent statements in his earlier deposition), Mr. Schlesinger also had available the full text of Amendment No. 3 and the one-page Section F of the original solicitation. Declaration of Ronald A. Schlesinger, Mar. 28, 1990, ¶ 5. He did not review the entire original solicitation, however.

Mr. Schlesinger telephonically spoke with Contracting Officer Cooper. The problem emerged that Amendment No. 3 "stated unequivocably" that the type of contract had changed from a "fixed-price indefinite quantity type of contract to a firm fixed-price type of contract." Deposition of Ronald A. Schlesinger, Mar. 9, 1990, at 20. Mr. Schlesinger's immediate concern was that the attempt to change the type of contract had not been fully implemented. For example, he pointed out the amendment did not provide another page for the additional pricing that was required or an instruction as to where to supply the pricing.

During their conversation Contracting Officer Cooper confirmed to Mr. Schlesinger his intention to convert the contract from an indefinite quantity type to a firm fixed-price contract with an option for additional quantities. However, in a subsequent tri-party telephone conversation with

Hilary B. "Buck" Myers, Assistant Director for Contract Compliance and Review with the Department of Justice's Office of the Procurement Executive, Mr. Cooper changed his mind and stated that he really wanted an indefinite quantity type of contract. As Mr. Schlesinger related the colloquy:

> The problem was that what he intended to do at the time, he did it, his intent was to make it a firm fixed price and he made it a firm fixed price, and then he realized that that was a terrible mistake, that what they needed as a type of contract is what they went out for initially, that what he had done, for whatever causes a person to make a stupid-type mistake, happened here, and the type contract simply didn't meet their needs....

Schlesinger Dep. at 32.

It was believed by Messrs. Cooper, Myers, and Schlesinger that the Southern Regional Office could not make an award for a firm fixed-price contract if it did not meet the needs of the Port Isabel SPC and that the circumstance constituted a basis for cancellation under the Federal Acquisition Regulations, 48 C.F.R. ("FAR") § 14.404-1(c)(1) (1989). This regulation authorizes an agency head—here, the Commissioner of the INS—to cancel a solicitation after bid opening for a compelling reason, such as inadequate or ambiguous specifications. Although Contracting Officer Cooper testified that the decision to recommend cancellation "probably originated with Ron Schlesinger," Deposition of Arthur S. Cooper, III, Mar. 9, 1990, at 53, defendant takes the position that the decision to initiate the cancellation process lay with Contracting Officer Cooper per the final paragraph captioned "Determination" in the document next discussed.

Then ensued the January 9, 1990 "Findings and Determination pursuant to Subpart 14.1 of the Federal Acquisition Regulations" signed by Contract Specialist Jones, with the concurrence of Mr. Cooper and approval of Michael C. Mattice as (Chief) Contracting Officer. Although Mr. Jones wrote much of the document, it represents Contracting Officer Cooper's decision:

> 3. On December 12, 1989, Amendment three (3) to the solicitation was issued to correct some solicitation deficiencies, make clarifications and extend the bid due date. Initial bids were received from seven bidders, six were received on December 18, 1989 at 2:30 p.m., Dallas, Texas time, and one received late on December 19, 1989.
>
> 4. Out of the seven initial bids received three were declared nonresponsive, one received late and remained unopened. Vanguard Security, Inc. was the apparent low (responsive) bidder, with a bid for the initial period of $1,352,-959.82 and an overall total bid including four year options of $9,570,872.13. The second lowest bidder was Burns International Security Services, Inc., for the initial period at $1,373,872.13, with a total bid of $9,668,612.64, and the third lowest bidder was Eastern Maintenance and Services, Inc., with a bid for the initial period of $1,549[,]850.10 and a total bid of $10,800,959.22.
>
> 5. Amendment number three was issued changing the contract performance dates and updating the solicitation in regards to new and revised clauses and provisions required by the Federal Acquisition Regulations. The amendment contained two errors, resulting in the Contract being inadvertently changed into a "Firm Fixed Price" Contract instead of the desired (and appropriate) "Indefinite Quantity" Contract. The bidders were requested to enter bid prices for the initial period (item I) and for each of the four option years (Items II, III, IV, & V). The amendment also stated "Bidders must also enter a price for the additional guard hours provided for by the contract. Failure to provide a bid for all items cause the bid to be rejected and declared nonresponsive." The previously included clause, "Indefinite Quantity" FAR 52.-216-22, remained in the solicitation.
>
> 6. The specific point of contention Burns International has is that the element above was not provided in the bid package [from] Vanguard Security Ser-

vices from Houston, Texas. Per Burns International they provided a bid for all items as clearly demanded by the specifications and firmly requested all other bids are nonresponsive and should be rejected.

This is significant in that the amendment also contained the erroneous statement that the resulting contract was to be a "Firm Fixed Price Contract" in lieu of the intended and appropriate "Indefinite Quantity Contract." The amendment's requirement that bidders include a separate bid price for the additional services suggests the apparent intention and existence of an "option" clause providing for such additional services, indicative of the contract being a "Firm Fixed Price" variety. Burns' having provided a separate price for additional services even though there was no special provision in the Bid Schedule for inclusion of such prices, is indicative of the expectation that an option for such services was intended, hence a Firm Fixed Price Contract.

7. Per phone conversation with VanGuard Security, Inc.'s representative stated "that to his understanding, because there was not a space available for estimated pricing for the additional 120 man hours per month, his bid would be accepted with the 120 man hours being covered by the initial bid."

The remaining bidders, including the apparent low responsive bidder, VanGuard Security, apparently interpreted that the intended contract was to be an Indefinite Delivery Contract by virtue of their not having questioned the changes in the amendment and conflicts within, and by not inserting a separate bid price for additional services as required by the text of the amendment, knowing that failure to do so would render the bid non-responsive. It is apparent here that these bidders expected that their unit bid prices for the initial and option years would also be considered as prices for any additional services, if ordered, hence an indefinite Quantity type contract was intended, in spite of the statement within the amendment to the contrary.

Determination

1. Based on the Determination the foregoing findings it is hereby determined in accordance with Federal Acquisition Regulations 14.404–1 that it is the opinion of this writer that the solicitation as amended reflects a stronger intention of the Contracting Officer that the resulting contract was to be a "Firm Fixed Price" type of contract, in lieu of the desired "Indefinite Quantity" type of contract. In that the Service needs the ability to order additional services as described in the solicitation on very short notice, a Firm Fixed Price Contract containing an option clause providing for the exercise of an option in order to provide for such services, is not a realistic alternative. In that there was apparently some confusion among the bidders over the intended contract type, and that the contract type is now stated (per the amendment) to be a Firm Fixed Price Contract, which is not suitable for our purposes, it is determined to be in the best interests of the Service to cancel this solicitation.

Defendant emphasizes that the key decision of Mr. Cooper is that, in his view, the amended solicitation reflects a "stronger intention of the contracting officer" that the contract was to be fixed price and did not meet the needs of the INS.

The "Findings and Determination" document was provided to the INS Commissioner. In addition, the Commissioner's determination was based on several other documents, among which was a January 10, 1990 memorandum to file prepared by Mr. Schlesinger and signed by Chief Contracting Officer Mattice, who thereby determined that "compelling reasons" exist for the cancellation of DLS–2–90 based on the following analysis:

Several amendments were issued to the solicitation, including Amendment No. 3. Amendment No. 3 revised several clauses and unfortunately changed the type of contract from fixed price indefinite-quantity to firm-fixed-price. Unfortunately, the manner of effecting the

change caused considerable confusion among offerors, causing several to be nonresponsive. Further, upon reflection, it has been determined that the use of options to obtain additional services as required in a firm-fixed-price type of contract does not meet the Government's minimum needs.

> It is a maxim of Federal procurement law that inadequate or ambiguous specifications constitute a compelling reason to cancel a solicitation if offerors would be prejudiced or if, based on the solicitation as issued, the needs of the Government would not be met.

Five administrative, management, or legal officials of the INS concurred in the recommendation bearing Mr. Mattice's signature. Commissioner Gene M. McNary signed and adopted it on January 30, 1990. In addition, Mr. Schlesinger prepared a one-page Executive Summary for Mr. McNary's attention, which stated in pertinent part:

> A compelling reason that justifies cancellation is when offerors are prejudiced due to the defect and when the Government's needs will not be met by the solicitation as issued.
>
> Amendment No. 3 to the solicitation changed the type of contract. After careful reevaluation, it has been determined that the change was not appropriate and the type of contract selected will not meet the needs of the Government. In addition, the amendment created confusion that was prejudicial to several of the offerors.
>
> Accordingly, based on the circumstances reflected herein, it is necessary to cancel the solicitation. In accordance with the Federal Acquisition Regulations this decision rests with the Commissioner. It is requested that the memorandum to the contract files be signed not later than January 24, 1990.

Contracting Officer Cooper's February 13, 1990 letter notifying all bidders of the cancellation followed. The letter also advised that he intended to resolicit the services under an indefinite quantity contract for a period of April 15, 1990, through July 31, 1990, extendable for one six-month period, in the form of a competitive Request For Proposals, not by sealed bidding, to be followed by a new solicitation requesting sealed bids for the same type of contract for a period commencing on August 1, 1990, and continuing no longer than September 30, 1994.

Plaintiff sued on March 5, 1990, to enjoin resolicitation of the services covered by DLS-2-90, to reinstitute the solicitation, and to prohibit award of a contract for the same services to any other bidder. Plaintiff alternatively sought the costs of preparing its bid. Defendant agreed to withhold resolicitation until the claim for injunctive relief was resolved. An agreed-to scheduling order entered whereby the case was set for trial unless plaintiff filed a dispositive motion. After plaintiff moved for summary judgment, defendant and Burns cross-moved.

In its cross-motion, defendant adduced two new grounds to justify the cancellation. Contracting Officer Cooper sponsored both in his post-deposition declaration:

> 4. Solicitation No. IFB/DLS-2-90 provides in Part I, Section C:
>
> C. GUARD POST ASSIGNMENTS
>
> 1. PRODUCTION (Guards)
>
> There are total of twenty (20) post assignments.
>
> Eight (8) posts are fixed positions within the female detention area. These posts will be manned twenty-four (24) hours a day, seven days a week, [three (3) eight (8) hour shifts each day [11PM-7AM; 7AM-3PM; 3PM-11PM].
>
> Twelve (12) posts are entrance control and roving patrols around the perimeter gates and male detention area. These posts will be manned twenty-four (24) hours a day, seven (7) days a week, three (3) eight (8) hour shifts each—[11PM-7AM; 7AM-3PM; 3PM-11PM].
>
> 5. Solicitation No. IFB/DLS-2-90 does not specify the INS's requirements for supervisory post assignments.
>
> 6. The Port Isabel Service Processing Center currently requires 30 production guard post assignments and two supervi-

sory post assignments. These 30 guard posts are critical to the security of the facility.

7. On November 24, 1989, Dwayne E. Petersen, Associate Regional Commissioner, approved funding to maintain the current level of 30 production guard post assignments and two supervisory post assignments at the Port Isabel facility.

8. Amendment No. 3, issued on December 12, 1989, should have reflected the INS's actual requirements of 30 production guard post assignments and two supervisory guard post assignments. Through inadvertence the amendment did not reflect that need.

9. Therefore, Solicitation No. IFB/DLS-2-90 seriously understates the Government's needs for guard services at the Port Isabel facility.

10. Any invitation for bids for the procurement of guard services at Port Isabel Service Processing Center in the immediate future will properly reflect the requirement for 30 production guard post assignments and two supervisory post assignments.

Declaration of Arthur S. Cooper, III, Mar. 28, 1990 ¶¶ 4-10. It is undisputed that these defects became apparent to INS contracting personnel only during litigation. *See* Burns' Br. filed Mar. 27, 1990, at 26. Indeed, Mr. Cooper's deposition taken on March 9, 1990, before plaintiff filed its motion, did not unveil them.[1] It should also be noted that these purported defects did not derive from any problem with Amendment No. 3, other than the failure of the amendment to mention them.

As to the first newly discovered defect, the solicitation, as amended, omitted the provision setting forth the requirement that supervisors be provided for each shift. Burns' 1986 contract contained the desired provision:

> SUPERVISORY (Supervisor Guards)
>
> There are a total of two (2) supervisory positions per shift. These two positions will be manned twenty-four (24) hours a day, seven (7) days a week [three (3) eight (8) hour shifts a day—11PM–7AM; 7AM–3PM; 3PM–11PM].

Although the relative ratio of productive guard man-hours to supervisory hours in the amended solicitation is 10:1, bearing the implication that for every 20 guard hours 2 supervisory hours are to be provided, the amended solicitation does not speak to whether the 2 supervisors must be provided for each shift. Part I, Section C "Description/Specification/Work Statement," A. "General" states:

> The Contractor shall furnish unarmed security guard services (including management, supervision, manpower, (including relief guards) equipment, supplies, etc., as necessary) to provide guard services on a 7-days-a-week, **24-hours-a-day** basis, *including replacement of substitute equipment and manpower to continue full services* [emphasis in original], at all times at the Port Isabel Service Processing Center, Los Fresnos, Texas.

(Bold denotes emphasis added.) On November 24, 1989, plaintiff's Michael A. Murphy, Executive Vice President, wrote Contract Specialist Jones, as follows:

> You further advised me that an amendment to this effect [postponing bid opening] was forthcoming, and that an amendment would also be issued to clarify several items in the subject Invitation to Bid, specifically but not limited to the following items:
>
> 1. Page 3, Minimum Supervisory guard man hours; ...

This reference pertains to the number of hours on the pricing sheet, not the number of supervisory guards per shift.

As to the second newly discovered defect, Burns produced at argument a copy of a modification to its contract signed on July 26, 1989, increasing the number of guards per shift by 10 production guards,

1. In its March 14, 1990 answers to plaintiff's request for admissions and interrogatories, the INS noted that the Port Isabel SPC required 30 guards and 2 supervisors to be on duty. In the context of the responses, which addressed the INS' need for services of a temporary nature (so called "additional services") and not base hours, however, this information did not implicate another problem with the solicitation.

for a total guard force per shift of 30 guards and two supervisors. The original solicitation, unchanged by amendment, calls for 20 production guard posts. The bidders bid on that basis.[2] Contracting Officer Cooper avers that the INS currently needs the full complement of 30 and will issue an invitation for bids reflecting the requirement for 30 production guard post assignments. On January 25, 1990, Mr. Murphy prepared for plaintiff a memorandum discussing the status of the procurement after bid opening and noted:

> There may be an ancillary INS internal issue here, and that is the coverage levels. While the bid specs called for approximately 4,000 hours per week, it is my understanding that the actual coverage levels may be as high as 5,500 to 6,000 per week.

## DISCUSSION

In reviewing an agency decision to cancel a solicitation under FAR §§ 14.404–1(a), (c), the Claims Court's inquiry is restricted to "whether the contracting officer's interpretation of, and later decision to cancel, the solicitation was unreasonable or an abuse of discretion under the requirements set forth in 48 C.F.R. § 14.404–1(c)." *National Forge Co. v. United States,* 779 F.2d 665, 668 (Fed.Cir.1985). As *National Forge* illustrates, the contracting officer can provide the rationale for cancelling a solicitation. Mr. Cooper's February 13, 1990 notice of cancellation expands on the reasons adopted by Commissioner McNary and, therefore, constitutes additional justification for the decision to cancel.

Alternatively, injunctive relief can be granted if a contractor can establish a clear and prejudicial violation of an applicable procurement statute or regulation. *CACI Field Serv., Inc. v. United States,* 854 F.2d 464, 466 (Fed.Cir.1988) (per curiam). Plaintiff also complains that the regulation itself was violated, so the court is to examine both whether the agency determination—that of the Commissioner and Contracting Officer Cooper to cancel—is unreasonable or an abuse of discretion under the applicable procurement regulation and whether the INS's conduct violated the procedures set forth by the regulation.

The matter was presented, at plaintiff's election, on summary judgment. No genuine issue of material fact bars resolution of the claim to injunctive relief on the parties' cross-motions.[3]

2. Burns unconvincingly argues that even knowing that it was providing 30 production guards per shift, it did not alert the INS of the obvious understatement because Amendment No. 3 was received only several days before bid opening. The requirement of 20 post assignments appeared in the October 23, 1989 original solicitation. The record reflects that Burns, as the incumbent, monitored the procurement. For example, Burns wrote the Southern Regional Office on November 8, 1989, requesting a mandatory pre-bid conference for all bidders at the Port Isabel SPC to enable a "clear perception of ... mandatory costs" incurred by the contractor. Burns Br. filed Mar. 27, 1990, Ex. 2. However, Burns did not take occasion to question the 50–percent decreased manpower from the level that it had been providing since July 1989.

3. In its brief responding to defendant's and Burns' cross-motions, plaintiff took the position that the issue of "whether bad faith has permeated the solicitation" "is not now ripe for summary judgment," Plf's Br. filed Mar. 29, 1990, at 9, and that plaintiff "intends to fully litigate the issue ..." at trial. At argument plaintiff contended that it was entitled to summary judgment in its favor without further evidentiary proceedings, despite the new grounds for cancellation. Plaintiff did not indicate that it needed discovery to meet defendant's and Burns' cross-motions. In its post-argument brief, plaintiff asks for "discovery and further proceedings [to address] these new issues which were so lately presented." Plf's Br. filed Apr. 3, 1990, at 5. This post-argument request for discovery seems to have the objective of testing Contracting Officer Cooper's assertion that the INS's actual, present, and prospective requirement is 30 production guard posts.

Even though this proceeding was expedited, plaintiff was required to make a showing if it required discovery to test the truth of Mr. Cooper's assertion that the solicitation understated the requirement for guards. *Dunkin' Donuts of America, Inc. v. Metallurgical Exoproducts Corp.,* 840 F.2d 917, 919 (Fed.Cir.1988); *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1566–67 (Fed.Cir.1987). The occasion to do so was provided at argument. Plaintiff made no showing during argument or in its subsequent brief that discovery would do more than satisfy a speculative hope that the 30–guard requirement was invalid. "Summary judgment need not be denied merely to satisfy a litigant's

F.A.R. § 14.404–1 provides, in pertinent part:

> (a)(1) Preservation of the integrity of the competitive bid system dictates that, after bids have been opened, award must be made to that responsive bidder who submitted the lowest responsive bid, unless there is a compelling reason to reject all bids and cancel the invitation.
>
> (2) Every effort shall be made to anticipate changes in a requirement before the date of opening and to notify all prospective bidders of any resulting modification or cancellation. This will permit bidders to change their bids and prevent unnecessary exposure of bid prices.
>
> ....
>
> (c) Invitations may be cancelled and all bids rejected before award but after opening when, consistent with paragraph (a)(1) above, the agency head determines in writing that—
>
> (1) Inadequate or ambiguous specifications were cited in the invitation;

Before suit was filed, the INS cited ambiguous specifications as the reason for cancelling Solicitation DLS–2–90. The Court of Claims long ago instructed in refusing to allow a bidder to avoid the consequences of its bid: "To have a set of bids discarded after they are opened and each bidder has learned his competitor's prices is a serious matter, and it should not be permitted except for cogent reasons...." *Massman Constr. Co. v. United States,* 102 Ct.Cl. 699, 719, 60 F.Supp. 635, 643, *cert. denied,* 325 U.S. 866, 65 S.Ct. 1403, 89 L.Ed. 1985 (1945) (cited with approval in *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 912 (Fed.Cir.1988)). The late Sr. Judge White of the Claims Court embellished the predecessor regulation, substantially identical to FAR § 14.404–1, as follows:

> [B]ecause of the public interest in preserving the integrity of the competitive bid system, an invitation for bids must not be cancelled and all bids rejected after bid opening unless there is a "compelling reason" to do so. The purpose of thus restricting administrative authority to cancel an invitation for bids after bid opening has been explained by the Comptroller General in the following language:
>
> ... The rejection of all bids after they have been opened tends to discourage competition because it results in making all bids public without award, which is contrary to the interests of the low bidder, and because rejection of all bids means that bidders have extended manpower and money in preparation of their bids without the possibility of acceptance.
>
> ... As a general proposition, it is our view that the cancellation after bids are opened is inappropriate when an otherwise proper award under a solicitation would serve the actual needs of the Government.... [*Spickard Enterprises, Inc.,* 54 Comp.Gen. 145, 147 (1974).]

*P. Francini & Co., Inc. v. United States,* 2 Cl.Ct. 7, 9 (1983).

I. *Reasons for agency decision to cancel solicitation given at the time of cancellation*

1. As Contracting Officer Cooper stated in the "Findings and Determination," all the responsive bidders, other than Burns, inferred that a definite quantity type contract was intended, in spite of the statement in Amendment No. 3 that a fixed-price contract with option was contemplated. INS procurement personnel conducted no inquiry or investigation to support the finding that anyone, including Burns, was misled or confused by Amendment No. 3. If the resolution of plaintiff's claim to injunctive relief turned on contract interpretation, review of the solicitation as a whole, including Amendment No. 3, reveals that despite Contracting Officer Cooper's statement that he made a "grave error in judgment," Cooper Dep. at 25, and Procurement Analyst Schlesinger's characterization of the "sloppiness" in issuing Amendment No. 3, Schlesinger Dep. at 34, the solicitation can only be construed as

speculative hope of finding some evidence that might tend to support the complaint...." *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,* 739 F.2d 624, 627 (Fed.Cir.1984) (citation omitted).

inviting bids for a fixed-price indefinite quantity contract. "[T]he contract should be interpreted in a manner which gives meaning to all its parts and in such a fashion that the provision do not conflict with each other, if this is reasonably possible." *B.D. Click Co. v. United States,* 222 Ct.Cl. 290, 299, 614 F.2d 748, 753 (1980) (citing cases). The same maxim applies to interpretation of a solicitation. *See Blake Constr. Co. v. United States,* 202 Ct.Cl. 794, 798 (1973).

In other words, insofar as Amendment No. 3 attempted to convert an indefinite quantity contract into a fixed-price contract subject to options, the amendment failed to displace contract provisions inherent in an indefinite contract. *See Mason v. United States,* 222 Ct.Cl. 436, 449, 615 F.2d 1343, 1350, *cert. denied,* 449 U.S. 830, 101 S.Ct. 98, 66 L.Ed.2d 35 (1980) (guaranteed minimum quantity clause would be rendered superfluous if contract not construed as indefinite quantity). Indeed, the amendment itself added at least one provision confirming the nature of the contract as an indefinite quantity. Moreover, even if the solicitation could be characterized as unclear, no bidder was confused about the requirements of the solicitation, as amended.

Specifically, Amendment No. 3 did not attempt to change the following provisions of Solicitation DLS–2–90:

(1) The first page of the pricing sheet describes the "Supplies/Services" as a minimum quantity of productive and supervisory guard hours for the base year and each of four option years. The continuation page, which has been quoted above, states:

> Additional services above the minimum stated herein, may be required on an as needed, as ordered basis during the life of this contract, not to exceed 120 manhours per month. The unit price bid per hour is a firm fixed-price and will be used for payment of any additional services ordered.

(2) Part I, Section C "Description/Specifications/Work Statement," A. "General" provides, in pertinent part:

> The Contractor further agrees to provide temporary additional services upon request from INS, that are in addition to the manhours and services specified herein. Requests for these services may be initiated at any time of day. Under normal conditions at least forty-eight (48) hours advance notice shall be given, but less advance notification may be necessitated by operational circumstances of an immediate nature....

(3) The solicitation contained FAR clause 52.216–22 entitled "Indefinite Quantity," which sets forth a four-paragraph description for the scope and operation of an indefinite quantity contract. The solicitation contained an out-of-date clause, however, evidently drawn from Burns' contract, which stated that the contractor would not be required to make any deliveries under this contract after September 30, 1987 (or 1988).

Although Amendment No. 3 effected some changes, the pertinent amended provisions nonetheless fully intend an indefinite quantity contract:

(4) Amendment No. 3 reiterated Part I, Section F "Deliveries and Performance," C. "Ordering" and added two final sentences. The amended provision reads in full:

> C. ORDERING
>
> The minimum productive and supervisory hours are considered to be ordered when contract award is made.
>
> Additional services will be ordered by the placement of oral orders to the contractor in accordance with the procedures set forth in section C, Paragraph A, Page [5]. At the beginning of each month, an estimated written delivery order (OF–347) will be issued for anticipated additional services for that month. At the end of each month the delivery order will be amended to reflect the actual quantity of additional services ordered. *All delivery orders are subject to the terms of this contract. In the event of a conflict between a delivery order and this contract, the contract shall control.*

(Emphasis added denotes textual change.)

(5) Amendment No. 3, while amending Part I, Section F, A. "Period of Per-

formance" to indicate a firm fixed-price contract, reiterates most of the first two sentences of the third paragraph of that section, adding a third sentence. The paragraph, as revised, reads as follows:

> Additional services over and above the awarded minimum man hours may be ordered by INS not to exceed one-hundred (100) productive guard man-hours and twenty (20) supervisory man-hours per month. The prices bid *for these additional services* are firm-*fixed hourly rates. The contractor shall invoice for these additional services, and payment shall be effected, at the prices bid per hour, as ordered by the government, and performed.*

(Emphasis added denotes textual change.) As a matter of contract interpretation, designation of the contract as a firm fixed-price contract is consistent with a reaffirmation in the same section that it is an indefinite quantity contract. What does emerge, as a matter of contract interpretation, is that the prices for additional services, as well as for the base and optional years, are firm fixed hourly rates. This provision before amendment bore the same interpretation. *See Shader Contractors, Inc. v. United States,* 149 Ct.Cl. 535, 540, 276 F.2d 1, 4 (1960) (fixed price terms are totally consistent with requirements contract).

█ (6) Amendment No. 3 also added FAR clause 52.214–29 "Order of Precedence—Sealed Bidding" (Jan 1986). This clause provides in full:

> Any inconsistency in this solicitation or contract shall be resolved by giving precedence in the following order: (a) the Schedule (excluding the specifications); (b) representations and other instructions; (c) contract clauses; (d) other documents, exhibits, and attachments; and (e) the specifications.

The clause requires that the provisions of the schedule, *i.e.,* the pricing sheets, take precedence over any conflicting provisions found in other sections. The pricing sheets stipulate that additional services will be priced at the same rate as base hours. Thus, insofar as Amendment No. 3 added a Note to Part IV "Representations and Instructions," Section M "Evaluation Factors for Award," C. "Evaluation of Bids and Award Criteria," requiring that bidders must enter a price for the additional guard hours, the schedule is unequivocal that the prices bid for the base hours carry over for additional requirements, and the language of the schedule prevails over the amended note to this section.

It is therefore held, as a matter of contract interpretation, that the solicitation documents as a whole, including Amendment No. 3, contemplated an indefinite quantity contract.

█ 2. The issue, however, is not how a reasonable bidder should have interpreted the solicitation, but, rather, whether the INS's determination that compelling reasons existed warranting rejection of all bids and cancellation of the solicitation was unreasonable or an abuse of the Commissioner's and the Contracting Officer's discretion conferred by FAR §§ 14.404–1(a)(1), (c)(1). Commissioner McNary's and Contracting Officer Cooper's decision reflects two rationales: 1) that the amended solicitation would not meet the INS's needs because the INS would be required to utilize the time-consuming and formal process to exercise options to obtain additional services, as required in a firm fixed-price contract; and 2) that Amendment No. 3 created confusion that was prejudicial to several of the bidders.

After plaintiff filed suit, the INS responded to request for admissions, among which was Request for Admission No. 2:

> Do you admit that INS did not inquire of VanGuard in advance of February 13, 1990, whether VanGuard had been mislead by the alleged ambiguity?....

The INS's Response reads:

> Yes. However, the fact that bidders may have been confused by Amendment No. 3 was not the principal motivation for the cancellation of the solicitation. The principal motivation for cancellation of the solicitation was that the solicitation, as amended, did not allow the Government to obtain additional services on an immediate basis.

This response was repeated in answer to another request, as well. Since in defending the cancellation the INS does not take the position that the rationales were of equal weight, the inquiry becomes whether the Commissioner's and the Contracting Officer's interpretation of the effect of Amendment No. 3 on the solicitation was reasonable and within the discretion conferred by FAR § 14.404-1(c). *National Forge Co.,* 779 F.2d at 668. Since "the principal motivation for cancellation" was that the amended solicitation did not allow the INS to obtain additional services on an immediate basis, the record must ground the determination to cancel in a reasonable apprehension of what was effected by Amendment No. 3. It was Mr. Schlesinger's view in the memorandum he prepared for Chief Contracting Officer Mattice, concurred in by Commissioner McNary, and the basis for Contracting Officer Cooper's notice cancelling the solicitation, that normally options were required to be used in firm fixed-price contracts.

FAR § 16.201 defines fixed-price contracts as providing "for a firm price or, in appropriate cases, an adjustable price." Mr. Schlesinger characterized the original solicitation as a "fixed price indefinite quantity contract." Schlesinger Dep. at 21. FAR § 16.202-1 defines a "firm-fixed-price contract" as providing "for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract." The FAR contemplate that "indefinite-delivery contracts," which include "indefinite-quantity contracts," may be fixed price. Section 16.-501(c), states, in pertinent part:

> Indefinite-delivery contracts may provide for firm fixed prices (see 16.202), fixed prices with economic price adjustment (see 16.203), fixed prices with prospective redetermination (see 16.205), or prices based on catalog or market prices (see 15.804-3(c))....

The record upon which the Commissioner based his determination and the Contracting Officer Cooper predicated cancellation of the solicitation is devoid of any factual underpinning or legal requirement that by denominating the contract as "firm fixed price," the solicitation called for provision of additional services through options, as opposed to an indefinite quantity requirement. In fact, the very provision of Amendment No. 3 allegedly converting the contract into a firm fixed-price contract calling for options advises (1) that additional services over and above the awarded minimum may be ordered by the INS and (2) that the prices bid per hour are firm, fixed hourly rates that will be used in paying for additional hours, as ordered. Amendment No. 3, on the following page, also advises that additional services may be ordered by the placement of oral orders. Even apart from the numerous contractual provisions that reinforce the nature of the contract as indefinite quantity, the amendment itself reasonably cannot be construed as requiring that additional services be procured by options.

INS procurement personnel reinforced their belief that options were called for based on the requirement in Amendment No. 3 that additional hours must be separately priced. However, Amendment No. 3 did not amend the pricing sheet or otherwise advise bidders on how or in what manner they were to furnish additional information, deficiencies noted by both Messrs. Cooper and Schlesinger in their depositions. The INS did not cite to any regulations or other contractual provisions in support of its equating the language "firm fixed price" in tandem with the requirement that separately priced additional hours with an option contract. Contrary to Contracting Officer Cooper's notice of cancellation, this requirement does not "[suggest] the use of [o]ptions," using option clauses FAR § 52.217-6 "Option for Increased Quantity" or clause 52.217-7 "Option for Increased Quantity—Separately Priced Line Item." As plaintiff points out, FAR § 17.208(d) establishes that these two clauses, by their terms, do not pertain to contracts for services.

Plaintiff's discovery revealed through the deposition of Procurement Analyst Schlesinger that in his conversation with Messrs. Myers and Cooper, during which the decision was made to cancel the solicita-

tion because it no longer provided for the indefinite contract that met the INS's needs, neither Mr. Schlesinger nor Mr. Myers had the entire solicitation before them. It is not the function of an injunction proceeding to put on trial either the procurement process or the process for cancelling a solicitation. In view of the INS's acknowledged discretion to assess its procurement needs, it matters not that Mr. Schlesinger may have considered incomplete documentation and that Mr. Myers was considering no documentation, if Commissioner McNary's determination and that of Contracting Officer Cooper accreted a reasonable basis. The INS was entitled to solicit for an indefinite quantity contract and did so. By changing the description of the contract from an indefinite quantity to a firm fixed-price contract and by calling for pricing for additional hours, Amendment No. 3 did not obligate the INS to utilize time-consuming option procedures. At the most Amendment No. 3 may have created an ambiguity resolvable by the amendment's inclusion of the order of precedence clause. The clause itself contemplates that ambiguities can arise in solicitations and establishes that the schedule, *i.e.*, pricing sheet, will govern over "other instructions," such as the note requiring separate pricing of additional hours. This schedule is explicit that additional services be priced at the same rate as base hours.

The principal motivation for cancellation of the solicitation—to wit, that the solicitation did not allow the INS to obtain additional services on an immediate basis—lacks a rational basis both in law and in fact and cannot be upheld as a permissible exercise of the agency's discretion.

The second and subordinate rationale to uphold cancellation of the solicitation was that bidders were prejudiced by the ambiguity in the contract requirements. This rationale appears in the Executive Summary; Mr. Mattice's memorandum to the files of January 10, 1990 (authored by Mr. Schlesinger); and the "Findings and Determination" of January 9, 1990, representing the contracting officer's determination. Contracting Officer Cooper and Procurement Analyst Schlesinger confirmed that no investigation or inquiry was made of the bidders as to any confusion surrounding the nature of the solicitation or the effect of Amendment No. 3. Moreover, Mr. Schlesinger was incorrect when he wrote (in the memorandum from Mr. Mattice concurred in by Commissioner McNary) that the manner of effecting the change from an indefinite quantity to a fixed-price contract "caused considerable confusion among offerors, causing several to be nonresponsive." The record reveals that the only nonresponsive bids involved the failure of one bidder to acknowledge Amendments Nos. 1–3 and the failure of another to supply the required bid bond.

Burns contends that two potential bidders were confused because they wrote letters to the Southern Regional Office explaining that they would not submit bids in view of Amendment No. 3. Defendant does not sponsor this evidence on point—or, for that matter, even make the point. One potential bidder, USI Security Systems, by its President Carl L. Powell, wrote Mr. Cooper that he declined to bid "[d]ue to the many amendments involved with the project and the obvious uncertainty that is involved." The other potential bidder, DRM & Associates, Inc., stated: "If the bid is extended, we will be in a position to bid therefor." Mr. Powell explained in his declaration submitted by plaintiff that the uncertainty centered around the changing periods of performance. DRM's letter manifested no confusion. Moreover, the "Findings and Determination" of January 9, 1990 found that the five bidders other than Burns expected that the prices for the initial and option periods would be considered as prices for additional services. Contracting Officer Cooper concluded that because Burns "provided a separate price for additional services even though there was no special provision in the Bid Schedule for inclusion of such prices, is indicative of the expectation that an option for such services was intended, hence a Firm Fixed Price Contract." This train of thought is daunting: Because pricing for additional hours was required, although there was

nowhere to put it and one bidder placed it somewhere, the inference is drawn that that bidder expected an option for such services.

Plaintiff makes a substantial case that no prejudice to any bidder can be inferred from this record. Procurement Analyst Schlesinger identified both pages of the pricing schedule as consistent with an indefinite quantity contract. Neither of these pages was changed by Amendment No. 3, nor did Amendment No. 3 add any additional pricing sheets for completion by the bidders. The pricing sheets provided that unit prices bid per hour are firm fixed price and would be used for payment of any additional services ordered. On that basis Amendment No. 3's calling for pricing for additional services is redundant. Had Amendment No. 3 implemented that instruction by indicating to the bidders exactly where and how they were to price additional hours, the requisite confusion may have been created. That Burns supplied separate pricing for the base year did not create an ambiguity.

For its part, Burns takes the position that the requirement for separate prices could not be more clear. It listed the identical unit prices that it had bid per hour on the base contract for the initial year opposite the notation on the continuation page of the pricing sheet stating that additional services may be ordered and stating that the unit price bid per hour will be used for payment of any such services ordered. Had Burns listed a lower price, the INS may have reasoned that the solicitation should be cancelled because by awarding the contract to the low responsive bidder, plaintiff, it would not be procuring all services that may be required under the contract at the lowest procurement dollar. However, Burns' supplying redundant information removes this scenario from the hypothetical. The record reflects no evidence to support an agency determination that any bidder was prejudiced by being required to submit pricing information for additional hours, when 1) there was no pricing sheet that called for such information and 2) the pricing sheet, which took precedence over the instructions, specified that additional hours were to be compensated at the unit price bid per hour. *See Robert E. Derecktor of Rhode Island, Inc. v. Goldschmidt,* 506 F.Supp. 1059 (D.R.I. 1980) (cancellation held not for compelling reason because omission of an obviously redundant entry failed to render the bid documents ambiguous); *Isometrics, Inc.,* B-192151 (G.A.O. Sept. 13, 1978) (possible confusion among bidders as to use of alternate bidding schedules did not impact competition, since protestor was low bidder under either scenario).

Finally, as plaintiff points out, Amendment No. 3's requirement to price additional work would not have impacted the evaluation criteria for awarding the contract. The solicitation stipulated that the INS "will evaluate offers for award purposes by adding the total price of all options to the total price for the basic requirement...." The options referred to are the four option years. Based on this evaluation, plaintiff was declared the low responsive bidder, according to the "Findings and Determination." *See Richard Hoffman Corp.,* B-212775.2, 83-2 C.P.D. ¶ 656 (failure of bidders to detail line item prices did not constitute compelling reason for cancellation when award based on total price). Burns did not specify its redundant hourly rates for any of the four option years—only the base year. Therefore, even Burns was not responsive to the requirement to price all additional hours, and the INS could not have evaluated a different bid for these hours, if Burns had made one.

The decision to cancel the solicitation based on the perceived prejudice to bidders is without any factual predicate in the record that could justify the determination as reasonable or otherwise within the discretion of Commissioner McNary or Contracting Officer Cooper.

### II. *Reasons for agency decision to cancel solicitation given during litigation*

1. During litigation the contracting officer expanded his justification for cancelling the solicitation. Accompanying defendant's opposition brief was Mr. Cooper's

March 28, 1990 declaration urging two new grounds—the failure to specify the INS's requirements for supervisory post assignments and the serious understatement of guard posts.[4]

Plaintiff's post-argument brief challenges Contracting Officer Cooper's authority to state the INS's needs for guards at the Port Isabel SPC. It is true that Contracting Officer Cooper does not make requirements determinations. However, he speaks for the INS in announcing all the reasons that support cancellation of a solicitation.

FAR § 14.404–1(a)(2) charges the INS to make every effort both to anticipate changes in a requirement before bid opening and to notify the bidders of a resulting modification or cancellation, so that bidders may change their bids and so that the INS may prevent unnecessary exposure of bid prices. The record contains not a scintilla of evidence that INS procurement personnel made any effort to confirm that the solicitation reflected two thirds of the actual, present, and prospective requirement for production guards at Port Isabel SPC, so that the requirement must be changed. Moreover, Contracting Officer Cooper does not explain when or how he came to the realization that the requirement for 20 guard posts must be changed. The only showing on point is a declaration by one of plaintiff's attorneys to the effect that Burns' attorney of record advised two of plaintiff's attorneys on March 23, 1990, that the former would argue the understatement and that "the government may wish to adopt this argument as an alternate basis for its decision to cancel the solicitation." Declaration of Andrew T. Goodson, Mar. 29, 1990, ¶ 4.

Plaintiff asserts that it has demonstrated a clear and prejudicial violation of an applicable procurement regulation, thereby entitling it to injunctive relief under *CACI Field Services, Inc.*, 854 F.2d at 466. It is clear that FAR § 14.404–1(a)(2) is an applicable procurement regulation. It is clear that the INS made no showing that any effort was made to anticipate the requirement to increase the solicitation from 20 guard posts to 30, such that the change might have been made before bid opening. Finally, it is clear that plaintiff was prejudiced when its bid prices were unnecessarily exposed. *See Prineville Sawmill Co.*, 859 F.2d at 912. What is not clear is whether this regulation was "violated" for purposes of a claim to injunctive relief.

The court construes as hortatory the admonition of FAR § 14.404–1(a)(2) to make "[e]very effort" "to anticipate changes in a requirement" prior to bid opening. In this case plaintiff has adduced evidence that the agency unreasonably delayed by making a showing that Burns sparked the INS's focus on the understatement. Defendant's evidence is Contracting Officer Cooper's declaration, which not only negates the inference that any effort was made, but supports an inference that no effort was made. However egregious the facts in this case, a court cannot enjoin a procurement based on the finding that fewer efforts than "every" effort to anticipate changes in a requirement were made, and such a rule of law would emerge if plaintiff's position were adopted. Another reason counsels forbearance. FAR §§ 14.404–1(a)(1), (c)(1) contemplate that an agency may cancel a solicitation after bid opening if a compelling reason exists, for example, if the specifications are inadequate or ambiguous. Under plaintiff's interpretation of the regulation, failure to make every effort timely to anticipate that the stated needs were inadequate would prevent the agency from effecting a cancellation. Yet, if the same agency unreasonably delayed in identifying an ambiguity that did not have anything to do with changes in a requirement, FAR § 14.404–1(a)(2) would not come into play. The interpretation that only section 14.404–1(a)(1) decisions to cancel based on changed requirements would be overridden due to

4. In its post-argument brief, plaintiff stated, "[D]efendant's counsel admitted at the hearing that 'this new argument is merely a "strategy," "developed during litigation" to avoid liability.'" Plf's Br. filed Apr. 3, 1990, at 3. The context of counsel's remarks was that defendant accepted the consequences of making the new argument at this late date.

an agency's failure to make every effort timely to identify such changes under section 14.404–1(a)(2) makes no sense and is rejected. Finally, as a policy matter, the Government should not be forced to accept service contracts that understate its needs even if the understatement was the Government's fault. The primacy of the procuring agency's assessment of its own needs and the penalty to the fisc transcend the harm to the frustrated bidder in losing the prospective contract.

The INS's conduct under the standards of FAR § 14.404–1(a)(2) is pertinent to plaintiff's alternative claim for bid preparation costs. *See Eastern Marine, Inc. v. United States,* 10 Cl.Ct. 184 (1986) (order on claim for attorneys' fees discussing award of bid preparation costs when agency prejudiced bidder by not informing bidder earlier that its proposal could not qualify). FAR § 14.404–1(a)(2) required, at a minimum, that INS contracting personnel identify the requirement that 20 guard positions must be changed to 30 during the 2–month period between issuance of the solicitation (October 23, 1989) and bid opening (December 18, 1989). During this period the INS issued 3 amendments. Amendment No. 3 was issued expressly to clarify the solicitation. It did not mention the number of guards. Nor did the notice of cancellation issued on February 13, 1990.

2. Since the court rules against plaintiff on its claim to injunctive relief based on a clear and prejudicial violation of an applicable procurement regulation, remaining for consideration is plaintiff's claim that the decision to cancel based on two new rationales under FAR § 14.404–1(a)(1) was an abuse of discretion or unreasonable. Once again, plaintiff takes the tact that the solicitation, as amended, readily admits of solutions to the defects perceived by the INS.

As plaintiff observes, the solicitation provided in Part I, section C "Description/Specifications/Work Statement," A. "General" that the INS could obtain additional services, if a continuing need should arise, by negotiating a contract modification. However, the magnitude of the understatement of guard posts represents an increase of 50 percent (10) over the manpower level bid on (20). To meet its needs, the INS would be required to negotiate a modification to reflect 30 production guards per shift.

The failure to state needs adequately in a solicitation, such that a significant modification to the contract would be required if the agency's needs were to be met during performance, is a "compelling reason" to cancel a solicitation. *See American Gen. Leasing, Inc. v. United States,* 218 Ct.Cl. 367, 374, 587 F.2d 54, 59 (1978) (Government retains the right to reject all bids without liability on the basis of a change in the procuring agency's requirements); *Caddell Constr. Co. v. United States,* 7 Cl.Ct. 236, 241 (1985) (erroneous or defective specifications may, on appropriate facts, be a proper basis for the contracting officer to reject all bids); *Aviation Enter., Inc. v. United States,* 8 Cl.Ct. 1, 19 (1985) (solicitation cancellation based upon overstated specifications was reasonable); *see also American Television Sys.,* B–220087.3, 86–1 C.P.D. ¶ 562, at 2 ("Changing the requirements of a procurement after bid opening to express properly the contracting agency's minimum needs generally constitutes a compelling reason for cancellation...."); *Dyneteria, Inc.,* B–211525.2, 84–2 C.P.D. ¶ 484, at 2–5 (anticipated increases in requirements and change in type of aircraft using the military base were compelling reasons to cancel solicitation after bid opening); *Kings Point Mfg. Co., Inc.,* B–210757, 83–2 C.P.D. ¶ 342, at 3 (contracting officer correct in cancelling solicitation for parachute harnesses after bid opening, where specifications would result in unsafe product).

The rationale is simple: To allow a contractor that was the low bidder under a defective solicitation an exclusive opportunity to contract for the agency's real, but unexpressed, needs would be prejudicial to the other bidders. *See, e.g. Dyneteria,* 84–2 C.P.D. ¶ 484, at 6 ("Such an action clearly would be prejudicial to other bidders under the invitation because the contractor would be awarded the new requirements essentially on a sole-source basis,

thus circumventing the competitive procurement statutes....”); *Intercomp Co.*, B-213059, 84-1 C.P.D. ¶ 540, at 5 (It would be prejudicial to other bidders “to permit Intercomp, simply because it submitted the low bid on the deficient specifications, an exclusive opportunity to revise its bid, or explain what it really meant, in order to keep the contract....”); *W.M. Grace, Inc.*, B-202842, 81-2 C.P.D. ¶ 121, at 2 (“An attempt by the contracting officer to negotiate changes with the low bidder which amount to a substantial deviation from the original specifications would be prejudicial to the other bidders because the contract after negotiation would not be the same as that offered the other bidders under the invitation....”). Such an action would amount to a *de facto* sole source award of the actual needs and a significant distortion of the competitive bidding process.[5] *Dyneteria*, 84-2 C.P.D. ¶ 484, at 6.

Defendant and Burns argue that plaintiff was aware after bid opening and before this action was filed that the INS had understated its needs by as much as 1,500 to 2,000 hours per week, as discussed in Mr. Murphy's memorandum of January 25, 1990. This internal memorandum lends substance to the INS's assessment of its manpower needs at the Post Isabel SPC; it does not implicate plaintiff's *bona fides* in filing this lawsuit.[6] However, defendant's point is well taken that the memorandum is inconsistent with plaintiff's contention that the defect is immaterial.

Burns presented a calculation that corresponds the hours generated by an additional 10 guards to Mr. Murphy's estimate of 5,500 to 6,000:

$$\frac{30 \text{ guards} \times 24 \text{ hrs} \times 30 \text{ days}}{4 \text{ weeks}} = \frac{21{,}600}{4 \text{ weeks}} \text{ hrs/mo} = 5{,}400 \text{ hrs/week}$$

Ten additional guard posts translates to 7,200 additional man-hours per month, or 72 times the stated maximum of 100 hours per month for temporary additional production guard services. At plaintiff's bid of $10.50 per guard hour, provision of the additional manpower would approximate $900,000.00 per year. The understatement of guard post assignments, thereby soliciting bids for 20 instead of 30—a required number and not a fluctuating need, accord to Contracting Officer Cooper—is an error that renders the solicitation defective. The INS reasonably and within its discretion deemed inadequate the subject specifications because they require, upon contract award, an immediate major modification of the number of guards.

Another provision of FAR § 14.404-1 supports this result. Subsection (a)(3) provides, in full:

> As a general rule, after the opening of bids, an invitation should not be cancelled and resolicited due solely to increased requirements for the items being acquired. Award should be made on the initial invitation for bids and the additional quantity should be treated as a new acquisition.

Regulatory admonitions that agencies should not cancel solicitations just because their needs are for greater quantities than those listed in the solicitation are meaningful only in the context of supply contracts. In supply contracts additional quantities can be purchased through additional procurements—perhaps from different suppliers—without prejudice to the agency. *American Television Sys.*, 86-1 C.P.D. ¶ 562, at 3; *W.M. Grace, Inc.*, 81-2 C.P.D. ¶ 121, at 3. Service contracts do not contemplate fungible widgets. If the INS were prevented from resoliciting the subject contract, the agency could not be expected to procure the 10 additional guards

5. Plaintiff does not qualify for any of the exceptions to contracting under full and open competition. *See* FAR §§ 6.302-1, 6.302-2.

6. Plaintiff argues in its post-argument brief that this memorandum is consistent with the solicitation's invitation to inquire about the post assignments prior to bidding. Plaintiff's memorandum was written over a month after the bids had been opened.

from another contractor, thereby requiring it to coordinate between two service providers.

Contracting Officer Cooper's eleventh-hour declaration also pointed out the absence of a specific contractual requirement for 2 supervisors per 8-hour shift. The court has scoured the solicitation documents and cannot accept plaintiff's argument that the requirement can be inferred from the obligation to furnish supervision on a 24-hour-a-day basis. Since 20 production guards must be provided per day, plaintiff reasons that 2 supervisors are required per shift. The relative ratio of production guard to supervisor hours is 10:1, as revealed in the amended schedule, but the requirement that 2 supervisors must be provided on every shift is unstated and, indisputably, was omitted. Moreover, the ratio of additional hours per month (100 productive guard man-hours and 20 supervisory hours) is 5:1, so that the requirement cannot be inferred from the relative ratio alone.

Before bid opening plaintiff wrote Mr. Jones that clarification was anticipated concerning the "Minimum Supervisory guard man hours," referring to page 3 of the pricing sheet. This reference, contrary to defendant's assertion, is not inconsistent with plaintiff's argument that the defect is immaterial, since the letter deals with the number of hours, not the number of supervisors per shift. In its post-argument brief, plaintiff contends that this letter shows that plaintiff investigated and apprised itself of current staffing levels. The letter is not susceptible of plaintiff's construction.

According to plaintiff, the provisions of 2 supervisory guards per shift can be inferred from the solicitation's contemplation in the "Policies and Guidelines" section. This provision requires immediately after contract award that the INS and the contractor coordinate to review performance requirements for guard post assignments. The solicitation reasonably cannot be read to leave such a central requirement to post-award discussion. Plaintiff's references throughout the solicitation to "supervisors," to the "Shift Supervisor," to the "Shift Sergeant," and the "Supervisory Detention and Deportation Officer" do not illuminate the requirement. Although plaintiff's strained interpretation of the solicitation to avoid the deficiency is heroic, it is held that the INS reasonably and within its discretion deemed specifications ambiguous or inadequate when such a fundamental deficiency in staffing supervisors is apparent.

3. Defendant persuades that the solicitation was "seriously flawed," as its counsel opined at argument. However, the conclusion is accurate only because of the defects revealed on March 27, 1990, when Mr. Cooper's declaration (signed one day later) was filed and served on plaintiff. The propriety of this evolving identification of compelling reasons to cancel the solicitation must be addressed.

Setting aside for the moment the issue of whether the conduct of INS procurement officials or the reasons originally articulated by them lured plaintiff into the present litigation, the integrity of the procurement process would be undermined if defendant were not allowed to advance its *post hoc* justifications for the cancellation. While untimely, defendant's arguments concern the integrity of the procurement process and the additional damage that would be occasioned if the award were made on the IFB as issued.

The decisions of the Claims Court do not speak to the precise factual scenario presented by this case. In *RADVA Corp. v. United States,* 17 Cl.Ct. 812, 821 (1989), the agency was allowed to muster its justification for cancellation during litigation because the court considered that "a reasoned basis appears in the record for the action taken....", even if the agency had not before stated its reasons. Apparently, no issue was made absent the delay in justification; rather, the contractor complained that the agency head had failed to make the requisite determination in writing. In *Olympia USA, Inc. v. United States,* 6 Cl.Ct. 550, 553-54 n. 1 (1984), the Claims Court commented that the justification for a nonresponsiveness determination

developed by the agency after suit commenced would not be accorded much weight. The case did not involve a cancellation, however.

Allowing defendant to supplement the agency decision with additional justifications is in accord with the contributions to contract law made by the Comptroller General, although it is noted decisions of the Comptroller General are not binding upon the Claims Court. *National Forge,* 779 F.2d at 668; *see Honeywell, Inc. v. United States,* 870 F.2d 644, 649 (Fed.Cir. 1989). In *NonPublic Educational Services, Inc.,* B-207751, 83-1 C.P.D. ¶ 232, the Comptroller General held that where a subsequent reason justifies the cancellation of a solicitation, the earlier basis of the contracting officer's decision need not even be considered. *NonPublic Education,* 83-1 C.P.D. ¶ 232, at 2. In that case the importance of having Service Contract Act provisions and a wage rate determination accompany the contract outweighed parallel considerations of whether contracting officials had correctly identified problems in the solicitations. Similarly, the protest in *Universal Communications Systems, Inc; Fisk Telephone Systems, Inc.,* B-198553, 81-1 C.P.D. ¶ 321, is instructive. The Veterans Administration conceded the fact that the justification originally advanced in support of cancellation was erroneous. The Comptroller General still found that failure to disclose a significant evaluation factor, upon which the Government would evaluate bids, was a compelling reason to cancel the solicitation. *Universal,* 81-1 C.P.D. ¶ 321, at 2. Particularly where there was a danger that defects in the bid documents would mislead bidders and influence the nature and structure of proposals received by the Government, maintaining the integrity of the process was of paramount importance; the reasoning of the contracting officer was less so.

The court recognizes that in a given case an agency could be foreclosed from mustering during litigation its compelling reasons to cancel a solicitation. In *Prineville Sawmill,* for example, the agency was not allowed to cancel a solicitation after bid opening when the agency found its bid estimates to be in error. The agency's delay was unexcused. Pivotal to the appellate court's decision, however, was the fact that the estimates originally supplied to the bidder were not of such magnitude to render the original estimate "grossly inaccurate." 859 F.2d at 913. In the case at bar, the defects latterly put forward are substantial and visceral to the contract. The understatement of guard posts alone rendered the number on which bids were solicited grossly inaccurate. Therefore, the INS's decision to cancel Solicitation No. IFB/DLS-2-90 was reasonable and within the agency's discretion. Since the specifications were defective, a compelling reason existed for cancellation after bid opening.

The foregoing demonstrates that plaintiff has failed to prove by a preponderance of evidence that the decision to cancel the solicitation was unreasonable and an abuse of discretion and, therefore, that it was not based on compelling reasons.

III. *Other showings for injunctive relief*

To show an entitlement to an injunction, plaintiff must make three additional showings: (1) that it will suffer specific irreparable injury if the procurement is not enjoined; (2) that the harm to be suffered by it outweighs the harm to the Government and third parties if the procurement is enjoined; and (3) that granting of the relief serves the public interest. *Washington Metropolitan Area Transit Comm'n v. Holiday Tours,* 559 F.2d 841, 842-43 (D.C.Cir.1977). Plaintiff has satisfied one of the other three requirements for injunctive relief. Absent injunctive relief, plaintiff would be irreparably damaged. An action at law would be in vain, because plaintiff could recoup only its bid preparation costs in a suit for damages, but not loss of anticipated profits. *Essex Electro Eng'r, Inc. v. United States,* 3 Cl.Ct. 277, 287 (1983) (citing cases).

FAR § 14.404-1(a)(2) identifies the unnecessary exposure of bid prices as a specific harm to a contractor in the context of sealed bidding once a solicitation is can-

celled after bid opening. *See Prineville Sawmill*, 859 F.2d at 912. Moreover, plaintiff has a legitimate interest in the integrity of the bidding process and access to the procurement dollar. Permanently enjoining the INS from resoliciting the subject procurement for guard services or from awarding a contract for the provision of these services to any bidder other than plaintiff, the lowest responsive bidder, nonetheless would effect greater harm on the INS, Burns, and any other interested party in this proceeding. If the award were to be based upon the IFB as issued, a modification increasing the number of guard posts by 50 percent would be needed immediately to meet the agency's minimum needs. An award to plaintiff under these circumstances prejudices the interests of other parties. The INS could not be assured that it was meeting its actual needs at the lowest overall price, having been deprived of an opportunity to achieve the lowest overall price through greater economies of scale. Likewise, the other bidders lacked the opportunity to rely on greater economies of scale in calculating bids.

The public interest takes the form of both ensuring the integrity of the procurement process and minimizing the costs of federal procurements. *Essex Electro Eng'r*, 3 Cl.Ct. at 288 (citing *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 846 n. 9 (D.C.Cir.1982)). Because contract award coupled with an immediate modification would amount to a *de facto* sole source award to plaintiff for the added requirements, and because other bidders have been denied an opportunity to show whether they could provide the lowest overall price to the Government, the public interest on balance would not be served by enjoining a resolicitation. If an injunction were to issue, competition would not be achieved on the added requirements, and other bidders would not be treated fairly or equally. Upon these facts an injunction is not in the public interest.[7]

---

7. Defendant does not invoke reasons for national security or defense as arguments against issuance of an injunction. *See* 28 U.S.C. § 1491(a)(3). Contracting Officer Cooper averred that the 30 guard posts are critical to

## CONCLUSION

Based on the foregoing, defendant's and Burns' cross-motions for summary judgment are granted as to Count I of the complaint, and plaintiff's motion for summary judgment is denied insofar as it seeks injunctive relief. Judgment on Count I of the complaint need not be entered at this time, since plaintiff may exercise its right to review pursuant to 28 U.S.C. § 1292(c)(1). Plaintiff and defendant shall file a Joint Status Report by April 18, 1990, proposing a course of proceedings to resolve Count II of plaintiff's complaint.

IT IS SO ORDERED.

the security at the facility. The court will not speculate as to the potentially adverse impact on national security if unarmed guards are not furnished at the Port Isabel SPC facility on the Mexican border.