**FILTRATION DEVELOPMENT CO., LLC, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 03–2835C.**

United States Court of Federal Claims.

Originally Filed Under Seal April 13, 2004.

Reissued For Publication April 27, 2004.

Robert S. Metzger, Washington, D.C., attorney of record for plaintiff, and Bryan Arnold and Mary Ita Snyder, of counsel.

David A. Harrington, Department of Justice, Washington, D.C., with whom was Assistant Attorney General Peter D. Keisler, for defendant. David M. Cohen, Director, and Robert E. Kirschman, Jr., Assistant Director.

Mike Lonsberry, U.S. Department of the Army, of counsel.

## OPINION and ORDER

FUTEY, Judge.

This post-award bid protest case is before the court on the parties' corresponding cross-motions for judgment on the administrative record, as well as plaintiff's request for a permanent injunction. Difficult questions pertaining to balancing the level of deference that should be afforded to military decisions with the enforcement of statutory and regulatory procurement laws are addressed herein. In this regard, the parties have raised numerous persuasive and thought provoking arguments which can be categorized into three predominate sections. First, the parties dispute whether the contracting officer

(CO) adhered to pertinent Organizational Conflict of Interest (OCI) regulations. Second, the United States Department of the Army's (Army) compliance with the requirements applicable to the invocation of the unusual and compelling urgency exception to the Competition in Contracting Act (CICA) has been placed in question. Third, the parties dispute whether plaintiff has clearly and convincingly demonstrated its entitlement to the extraordinary remedy of a permanent injunction.

### Factual Background [1]

Throughout the opinion, repeated references are made to engine inlet barrier filter (IBF) systems and so-called "A kits" and "B kits" which comprise the bulk of the system. The Army, defendant, has been on notice for several years, and it is undisputed, that the installation of a filter system significantly reduces damage caused by the ingestion of sand and foreign particles. The Army has twice sought to develop a solution, but both attempts proved unsuccessful. In this context, the IBF is attached to the UH–60 Blackhawk helicopter engine. The UH–60 helicopters to which the filter system will be attached are primarily scheduled to head toward the harsh desert terrain in Iraq. The helicopters being replaced in the combat theater were heavily damaged by the conditions. The "A kits" and "B kits" will work in tandem to counter the corrosive and deteriorating effects of sand particles. Each helicopter is first fitted with an "A kit," which serves a dual purpose: (1) it is the hardware to which the filter system is mounted, and (2) it permits monitoring of the filter system. The "B kit" is the actual interchangeable filter. The filtration system, therefore, requires both an "A kit" and a "B kit."

Pursuant to a previously awarded contract, No. DAAH23–02–C–0006 (Blackhawk Production Contract), Sikorsky Aircraft Compa-

ny (Sikorsky) is responsible for designing, developing and manufacturing the UH–60 Blackhawk helicopter. On July 23, 2003, under a different contract, Sikorsky was directed to conduct an engine filtration trade study. The trade study contemplated that Sikorsky would evaluate, in addition to two concepts chosen at its discretion, a design concept developed by Aerospace Filtration Systems (AFS), a division of Westar Corporation (Westar). In August 2003, however, the trade study was suspended and Sikorsky was directed to immediately begin incorporating the AFS design.

The parties contest two factual aspects of the August 2003 decision. First, the parties dispute whether Sikorsky was specifically directed to use the AFS design. In this regard, while the December 2003 contract modification does not expressly acknowledge such a requirement, two separate statements in the administrative record lead to an opposite conclusion.[2] Second, the parties dispute how the suspension came about. In the same statements referenced above, defendant contends that the decision to suspend the trade study was the result of an Army directive requiring that the acquisition of IBFs be expedited. As plaintiff correctly points out, however, the actual August 2003 directive is not included in the administrative record.

October 2003 proved to be an extremely important month in the context of this procurement. On October 9, 2003, a directive was issued in which the Army concluded that "installation of BLACK HAWK main engine barrier filters was required for ... deployment not later than [March 2004] to ensure required readiness in theater."[3] Further, the CO attended several meetings with Utility Helicopters Project Management Office (UHPMO) personnel and it was estimated that the number of aircraft scheduled for

---

1. The facts of this case were discussed in detail in the court's previous opinion on defendant's motion to dismiss. See *Filtration Dev. Co., LLC v. United States,* 59 Fed.Cl. 658, 659–60, 2004 WL 223988, at *1–2 (Fed.Cl. Feb.3, 2004). The undisputed factual assertions are repeated herein and supplemented where necessary to provide additional information pertinent to this opinion.

2. Administrative Record (AR) Exhibit (Ex.) A ¶ 3; AR Ex. O at 2.

3. Supplemental Administrative Record (SUP AR) at 0003.

deployment, and in turn, the number of IBF kits needed, was 240.[4]

The Army invoked the unusual and compelling urgency exception to full and open competition to procure the IBF's.[5] 10 U.S.C. § 2304(c)(2); 48 C.F.R. § 6.302–2(a)(2). The Justification and Approval (J & A) executed on November 5, 2003, and approved on November 10, 2003, provided that the United States Army Aviation Missile Command "propose[d] to acquire, utilizing an acquisition method other than full and open competition, 240 IBF Desert Kits."[6] The J & A also noted, *inter alia,* that (1) the kits would substantially reduce engine deterioration, (2) Sikorsky was the only contractor that could complete the assignment within the requisite time frame, and (3) "[s]ince these operations began, 400 engines have been removed/replaced at an approximate cost of $300 [million]."[7] In addition, the J & A provided that the IBF kits will be labeled "Special Mission Kits and . . . will be flown under an Airworthiness Release (AWR)."[8] The total cost of the procurement was estimated at $40.8 million.

As these events occurred, antecedent and parallel events giving rise to plaintiff's OCI claim were also taking form. In May 2000, Westar was the recipient of an Omnibus 2000 contract (O2K). Under the contract's Statement of Work, Westar was responsible for performing systems engineering and technical direction (SETA) tasks.[9] Westar's contemplated responsibilities under the O2K specifically included "Propulsion Systems/Technology."[10] In addition, according to plaintiff, Westar has received four task orders under the O2K in connection with the propulsion system for the UH–60 Blackhawk helicopter. Task Order 23 has drawn the most attention from the parties. Although the particulars of Task Order 23 are laid out in detail in the administrative record, defendant has conceded that the "scope of work under Task Order 23 includes '[p]ropulsion systems support' with respect to 'engine barrier filters.' "[11] Defendant's main objection to both the O2K and the accompanying task orders is not premised on the scope of work, rather defendant argues that the documents do not show the work that was actually tasked or performed under the contract.[12]

In a report dated May 16, 2003, Westar noted that it had "[p]repared for and participated in meetings to generate Propulsion-related project ideas. Explored Westar capabilities and problem areas in the Army aircraft fleet to plan future projects."[13] Plaintiff argues that what occurred next was a result of the above-mentioned work, whereas defendant maintains that the proximity of the two events was pure coincidence. On May 27, 2003, AFS made a presentation to the Army concerning "Inlet Barrier Filter (IBF) Systems for the H–60 Helicopter Main Engine Inlet."[14]

Returning to the fall of 2003, the various COs' actions in response to OCI concerns warrant attention. After the trade study was suspended in August 2003, a CO for the O2K apparently recognized the conflict and sought to implement precautionary measures. The extent of the CO's actions are reflected in the administrative record through two unsigned and unapproved mitigation plans.[15] The CO for the IBF contract, following correspondence from plaintiff's counsel, twice discussed the allegations of an OCI with Army personnel. The CO was informed that the Army had recognized the

---

4. AR Ex. A ¶ 3.

5. *Id.* Ex. C ¶ 4.

6. *Id.* Ex. C ¶ 3.

7. *Id.* Ex. C ¶ 5(d).

8. *Id.* Ex. C ¶ 7.

9. *Id.* Ex. S ¶ 2.0 (General Technical Requirements), ¶ 3.19 (Systems Engineering).

10. *Id.* Ex. S ¶ 3.17.

11. Compare Plaintiff's Statement Of Facts ¶ 46 with Defendant's Counter–Statement Of Facts ¶ 46.

12. Defendant's Counter–Statement Of Facts ¶¶ 38–40; see AR Ex. Y.

13. SUP AR 0086.

14. *Id.* 0015–0033.

15. *Id.* 0133–0140, 0142–0147.

conflict and that the appropriate measures were in place. On the basis of these representations, the CO concluded that a significant potential OCI did not exist.

On December 15, 2003, the Army executed a contract modification to Sikorsky's Blackhawk Production Contract and procured, *inter alia,* 183 "A kits" and 150 B kits.[16] The deliveries are scheduled to take place from March through July of 2004, with an incentive for accelerated deliveries. As of the date of this opinion, several developments have transpired. The IBF kit design was finalized and an airworthiness release certificate was issued.[17] In addition, although it does not appear that the overall delivery schedule will be affected, the initial deliveries have been pushed back approximately three weeks due to unexpected engineering difficulties.[18]

Prior to the December 15, 2003, contract modification being finalized, plaintiff had met with Army officials on several occasions to express its interest in providing IBF systems for the UH–60 Blackhawk helicopter. Despite the inquiries, meetings, phone calls, and emails, its efforts were to no avail. Plaintiff filed suit in this court on December 18, 2003. The court immediately placed the matter on an expedited schedule. After the parties completed their briefings, the court held oral argument on defendant's motion to dismiss for failure to state a claim upon which relief can be granted. Given the need for an expeditious resolution of the matter, defendant filed the administrative record on January 28, 2004. On February 2, 2004, the court denied defendant's motion to dismiss reasoning that it could exercise jurisdiction over plaintiff's allegations of procedural violations of CICA as well as OCI regulations. Defendant supplemented the administrative record on February 24, 2004. The parties filed simultaneous cross-motions for judgment on the administrative record on February 26, 2004. The parties filed their responses on March 4, 2004, and their replies on March 11, 2004. The court held oral argument on March 31, 2004.

In the interim, on March 2, 2004, plaintiff filed an amended complaint. In its prayer for relief, plaintiff, in pertinent part, asks the court for: (1) declaratory judgment that the procurement was in contravention of law and regulation; (2) permanent injunction limiting the current procurement to only the minimum amount necessary to satisfy the current emergency situation; (3) permanent injunction directing defendant to procure any amount over the minimum on a competitive basis; (4) permanent injunction preventing defendant or Sikorsky from awarding any subsequent contracts to either Westar or its affiliates for a time period no shorter than the duration of Westar's current O2K; and (5) permanent injunction precluding AFS from participating in the re-instituted trade study.[19]

*Discussion*

Motions for judgment on the administrative record are treated in accordance with the rules governing motions for summary judgment. RCFC 56.1; see *Nickerson v. United States,* 35 Fed.Cl. 581, 588 (1996), *aff'd,* 113 F.3d 1255 (Fed.Cir.1997). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Sec'y, DHHS,* 998 F.2d 979, 982 (Fed.Cir. 1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *Sweats*

---

**16.** AR Ex. K.

**17.** Transcript of Oral Argument (Tr.) at 38–39.

**18.** *Id.*

**19.** Amended Complaint (Amend.Compl.) at 17.

*Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1563 (Fed.Cir.1987). Alternatively, if the moving party can show there is an absence of evidence to support the non-moving party's case, then the burden shifts to the non-moving party to proffer such evidence. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir. 1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Prineville Sawmill Co., Inc. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987)). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc. v. United States*, 33 Fed.Cl. 514, 518 (1995). It, therefore, does not follow that if one motion is rejected, the other is necessarily supported. *Id.* Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Id.* (citing *Corman v. United States*, 26 Cl.Ct. 1011, 1014 (1992)).

■ Congress amended the Tucker Act in 1996 by granting this court jurisdiction to hear post-award bid protest actions. 28 U.S.C. § 1491(b)(4). The court reviews the challenged agency decisions according to the standards set out in the Administrative Procedures Act (APA), 5 U.S.C. § 706. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed.Cir. 2001) (citations omitted). In particular, the court must determine whether the agency's actions were arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A). A bid award may be set aside, therefore, "if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332 (citations omitted).

■ In determining whether the agency has acted arbitrarily and capriciously toward plaintiff, the court must consider four factors. *Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 574, 492 F.2d 1200 (1974). Specifically, the court must determine whether: (1) there was subjective bad faith on the part of the procuring officials; (2) there was a reasonable basis for the procurement decision; (3) the procuring officials abused their discretion; and (4) pertinent statutes and regulations were violated. *Id.*; see also *Aero Corp., S.A. v. United States*, 38 Fed.Cl. 739, 749 (1997). There is, however, "no requirement or implication ... that each of the factors must be present in order to establish arbitrary and capricious action by the government." *Prineville*, 859 F.2d at 911. The court must also "give due regard to the interests of national defense and national security and the need for expeditious resolution of the action." 28 U.S.C. § 1491(b)(3).

■ When reviewing agency action, the APA requires a "thorough, probing, in-depth review" to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In examining an agency's procurement action, the agency is given wide discretion in the application of procurement regulations. *Bellevue Bus Serv., Inc. v. United States*, 15 Cl.Ct. 131, 133 (1988); *CACI Field Servs., Inc. v. United States*, 13 Cl.Ct. 718, 725 (1987), *aff'd*, 854 F.2d 464 (Fed.Cir.1988). In this regard, the court cannot substitute its judgment for that of the agency, even if reasonable minds could reach differing conclusions. *CRC Marine Servs., Inc. v. United States*, 41 Fed.Cl. 66, 83 (1998). Indeed, "[t]he court should not substitute its judgment on such matters for that of the agency, but should intervene only when it is clearly determined that the agency's determinations were irrational or unreasonable." *Baird Corp. v. United States*, 1 Cl.Ct. 662, 664

(1983). As long as a rational basis is articulated, and relevant factors are considered, the agency's actions must be upheld. *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

 The "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.' " *Impresa,* 238 F.3d at 1333 (citing *Saratoga Dev. Corp. v. United States,* 21 F.3d 445, 456 (D.C.Cir. 1994)). When a protestor is asserting a violation of regulation or procedure, "the disappointed bidder must show a 'clear and prejudicial violation of applicable statutes or regulations.' " *Id.* (citing *Kentron Hawaii, Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973); *Latecoere Int'l, Inc. v. United States Dep't of Navy,* 19 F.3d 1342, 1356 (11th Cir.1994)). Moreover, "to prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996). To establish prejudice, a protestor must demonstrate that but for the alleged error, there was a substantial chance it would have received the award. *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir.1996).

## I. Organizational Conflict of Interest

Plaintiff advances a litany of arguments purporting to demonstrate violations of OCI regulations. Plaintiff maintains that the CO failed to adhere to procedural requirements. Plaintiff asserts that the CO did not take any actions to address the OCI until after plaintiff's counsel brought the issue to her attention. Plaintiff contends that the CO's determination that no significant potential OCI existed was unreasonable. Further, plaintiff avers that the CO cannot abdicate her responsibilities under the Federal Acquisition Regulations (FAR) simply because government personnel represented that the conflict had been addressed through the submission of mitigation plans. In this regard, plaintiff maintains that the mitigation plans were inadequate and that there is no evidence that the mitigation plans were executed. Building upon its argument that a significant OCI existed, plaintiff contends that the CO failed to obtain approval for a mitigation plan from the appropriate personnel.

Defendant asserts that the CO fully complied with her responsibilities under the FAR. Defendant contends that the CO was only required to act before the time of contract award, which she did. Defendant maintains that the CO properly consulted government personnel first in examining a possible conflict. Defendant also avers that because the government personnel had implemented appropriate precautionary measures, the CO's conclusion that no significant conflict of interest existed was reasonable. Further, defendant asserts that once the CO determined that no significant OCI was present, no further action was required on her part.

 The responsibility for ascertaining whether an actual or potential conflict of interest exists generally rests with the CO. 48 C.F.R. § 9.504(a). The CO is instructed to "[i]dentify and evaluate potential organizational conflict of interest *as early in the acquisition process as possible ....*" *Id.* § 9.504(a)(1) (emphasis added). For assistance in making this determination, the CO "should obtain the advice of counsel and the assistance of appropriate technical specialists ...." *Id.* § 9.504(b); see also *id.* § 9.506(a) (explaining that the CO "first should seek the information from within the Government ..."). The CO is not required to take additional steps if there is a determination that no significant conflict exists. *Id.* § 9.506(b); see also *id.* § 9.504(d) ("The [CO's] judgment need be formally documented only when a substantive issue concerning potential [OCIs] exists."). If the CO determines that a significant potential OCI may be present, however, certain steps must be taken before a solicitation is issued. *Id.* § 9.506(b). Amongst these steps, the CO must proffer a "recommended course of action for avoiding, neutralizing, or mitigating the conflict" to the head of the contracting activity or the chief of the contracting office. *Id.* § 9.506(b)(1); see also *id.* § 9.504(c). The conflict must be resolved in the appropriate fashion prior to the contract being awarded. *Id.* §§ 9.506(d)(3), 9.504(a)(2); see also *LeBoeuf, Lamb, Greene & MacRae, LLP v. Abraham,*

347 F.3d 315, 321 (D.C.Cir.2003). A CO's determination regarding whether the acquisition involves a significant conflict will be overturned only on a showing of unreasonableness. *Informatics Corp. v. United States,* 40 Fed.Cl. 508, 513 (1998).

■ The identification of the OCI in this case did not occur "as early in the acquisition process as possible ...." 48 C.F.R. § 9.504(a)(1). There was no recognition of any conflict in May 2003 when the Army began its discussions with AFS, despite clear signs that AFS was a division of Westar.[20] Likewise, in August 2003, noticeably lacking were any conflict concerns when UHPMO suspended the trade study and directed Sikorsky to "immediately begin design activity to incorporate the AFS filter system onto UH–60 aircraft."[21] Although defendant argues that the CO complied with her obligations because she determined that a significant OCI did not exist prior to the contract modification being executed, defendant overlooks that Sikorsky was incorporating AFS's design from August 2003 until October 2003 without any properly approved OCI safeguards. Contrary to defendant's assertions, such an assessment concerning any possible significant OCI would not have been overly premature. The FAR expressly contemplates that when analyzing significant potential OCIs, the determination occur prior to a solicitation being issued. 48 C.F.R. § 9.506(b). Further, the multiple unsigned mitigation plans contained in the administrative record do little to support defendant's position that the conflict was resolved prior to contract award.

The CO's determination that a significant OCI did not exist is contradicted by the record. The CO did properly contact other government personnel to apprise her of the situation. 48 C.F.R. § 9.506(a). Those personnel informed her that they recognized the potential for a conflict of interest.[22] Their conclusion was buttressed by Westar's submission of at least two proposed mitigation plans. It is, therefore, safe to conclude that all those involved recognized the significant

conflict. The CO, however, exceeded her authority by concluding that the appropriate safeguards were in place to eliminate the conflict. According to the FAR, that is not a decision the CO is empowered to make. 48 C.F.R. § 9.506(b). The authority to "[a]pprove, modify, or reject the [recommended course of action for avoiding, neutralizing, or mitigating the conflict]" rests with the chief of the contracting office. *Id.* § 9.506(b)-(d). Accordingly, the CO failed to abide by the procedures set forth in § 9.506.

Plaintiff also maintains that Westar, through AFS, is precluded from providing the IBF kits because Westar provides SETA services under its O2K. Plaintiff contends that Westar possesses an unfair competitive advantage through its access to information not available to other bidders, in particular source selection information. Further, plaintiff avers a significant OCI exists in light of Westar's vested interest in having AFS supply the IBF kits. Plaintiff also asserts that prejudice is presumed upon a finding of an actual OCI.

Defendant avers that there is no significant OCI because Westar never actually performed any work under either the O2K or the task orders in connection with the UH–60 Blackhawk helicopter or its propulsion system. Relying on the same line of reasoning, defendant argues that an actual OCI did not arise. Defendant also maintains that plaintiff's "unfair competitive advantage" argument is based on nothing more than speculation and borders on frivolous.

Given the "highly influential and responsible position" of contractors performing systems engineering and technical direction, 48 C.F.R. § 9.505–1(b), the FAR contains the following explicit prohibition:

A contractor that provides systems engineering and technical direction for a system but does not have overall contractual responsibility for its development, its integration, assembly, and checkout, or its production *shall not* (1) be awarded a contract to supply the system or any of its major

---

**20.** SUP AR 0015–0033.

**21.** AR Ex. A ¶ 3.

**22.** SUP AR 0001.

components or (2) be a subcontractor or consultant to a supplier of the system or any of its major components.

*Id.* § 9.505–1(a) (emphasis added); see also *Vantage Assocs., Inc. v. United States,* 59 Fed.Cl. 1, 10 (2003). Defendant appears to concede that Westar contracted to provide SETA services for the UH–60 propulsion system, but devotes significant attention to arguing that Westar did not perform any work pertaining to IBFs under the O2K. Specifically, defendant maintains that Task Order 23 only enumerates the work that could have been performed and does not enumerate the work that was actually performed. Defendant also submits a declaration that provides that Westar "did not received [sic] any taskings under their O2K contract task orders to provide any support, analysis, evaluation, development, or any other effort in connection with Engine [IBFs] on the UH–60 Blackhawk aircraft." [23] Defendant's argument misses the point.

The FAR prohibits a SETA contractor, as either a prime contractor or a subcontractor, from supplying any of the system's major components, without regard to whether work was performed as to that particular component. 48 C.F.R. § 9.508(a). The FAR's prohibition is clarified in the following illuminating example: "Company A *agrees to provide* systems engineering and technical direction for the Navy on the powerplant for a group of submarines . . . . *Company A should not be allowed to supply any powerplant components.*" 48 C.F.R. § 9.508(a) (emphasis added). Westar agreed to provide SETA services concerning UH–60 propulsion systems under its O2K.[24] For example, Westar "[p]repared for and participated in meetings to generate Propulsion-related project ideas. Explored Westar capabilities and problem areas in the Army aircraft fleet to plan future projects." [25] Westar also "[p]rovided

input on the rewrite of the Airworthiness Impact Statement" [26] and "[r]eviewed Standard Operating Procedures on the new Airworthiness Impact Statement Document." [27] Applying the reasoning of § 9.508(a), Westar or its affiliates were categorically precluded from supplying any propulsion system components. Simply put, Westar was improperly "in a position to make decisions favoring its own products or capabilities." 48 C.F.R. § 9.505–1(b). Through its contractual obligation to provide SETA services and through AFS's contractual obligations to provide IBFs, Westar as an entity occupied an impermissible dual role and an actual OCI, therefore, arose. *Matter of: Aetna Gov't Health Plans, Inc.,* B–254397.15, 95–2 CPD ¶ 129, at 18, 1995 WL 449806, at *11 (Comp. Gen. July 27, 1995) (explaining that the entity's "dual role[ ] placed it in an actual organizational conflict of interest because of the prospect that it would be unable to render impartial advice . . .").[28]

Plaintiff is, therefore, entitled to benefit from the presumption of harm/prejudice. *Id.* at 12, 1995 WL 449806, at *11 (citing *NKF Eng'g, Inc. v. United States,* 805 F.2d 372, 376 (Fed.Cir.1986), *Compliance Corp. v. United States,* 22 Cl.Ct. 193 (1990), *aff'd,* 960 F.2d 157 (Fed.Cir.1992)); see also *Matter of: DZS/Baker LLC,* B–281224, 99–1 CPD ¶ 19, at 7, 1999 WL 46706, at *4 (Comp.Gen. Jan.12, 1999) ("[W]e note that there is a presumption of prejudice . . . where a conflict of interest, other than a de minimis or insignificant matter is not resolved."). Although defendant maintains that the presumption can be rebutted through the implementation of adequate safeguards, the argument loses its persuasiveness given the court's conclusion concerning Westar's mitigation plans. While the court does not question the credibility or integrity of Westar to voluntarily comply with the recommended precautionary measures, the court cannot allow an unsigned

23. AR Ex. Y.

24. *Id.* Ex. S ¶ 3.17; *Id.* Ex. V ¶ 3.2.2.

25. SUP AR 0086.

26. *Id.* at 0085.

27. *Id.* at 0091.

28. Decisions of the Comptroller General in procurement cases are not binding on this court, nevertheless, the court may consider and adopt their reasoning in recognition of the Comptroller General's expertise and role in the resolution of contested procurement decisions. *Computer Sciences Corp. v. United States,* 51 Fed.Cl. 297, 308 n. 14 (2002).

and unapproved mitigation plan to stand. Therefore, a presumption of harm to the procurement process and prejudice accompanies Westar's dual role.

Several of plaintiff's remaining contentions deserve attention. First, plaintiff alleges that an OCI exists because of Westar's vested interest in ensuring that AFS remains a financially sound institution and because of the possibility that Westar obtained information from the Army that was not available to other bidders. Plaintiff's allegations appear to be considerations that would be encompassed within 48 C.F.R. § 9.505–1(a). These concerns would be present in any instance where a contractor is providing SETA services and an affiliate at the same time provides the underlying major component.

Second, the court does not believe that plaintiff has satisfied 48 C.F.R. § 9.505(b)(1)-(2). The United States Court of Appeals for the Federal Circuit (Federal Circuit) has made clear that conflict violations must be established through "hard facts." *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1582 (Fed.Cir.1983).[29] Plaintiff has not provided any factual basis upon which to conclude that Westar possessed "[p]roprietary information that was obtained from a Government official without proper authorization." 48 C.F.R. § 9.505(b)(1). Next, besides stating that Westar had "potential access to source selection information,"[30] plaintiff has provided no "hard facts" that Westar possessed said material. 48 C.F.R. § 9.505(b)(2). Accordingly, this argument fails.

## II. Unusual and Compelling Urgency

 Plaintiff asserts that defendant improperly invoked CICA's unusual and compelling urgency exception. Plaintiff maintains that the actual reasons behind the exception's invocation were a lack of advance planning and funding concerns. Plaintiff avers that the J & A does not adequately justify a sole source award to AFS. Further, plaintiff contends that the J & A does not adequately address the harm to the government. Plaintiff also questions the timing of the J & A. In addition, plaintiff asserts that defendant did not "request [offers] from as many potential sources as is practicable under the circumstances."[31] Plaintiff maintains that defendant procured more than the "minimum quantity needed to satisfy the immediate urgent requirement."[32] Plaintiff avers that the invocation of the unusual and compelling urgency exception must be temporally limited to the impending emergency period and that the current procurement in its entirety has exceeded that time frame. Lastly, plaintiff contends that defendant failed to conduct market research.

Defendant asserts that plaintiff conceded in its complaint that there is an urgent need for the filters. Defendant nevertheless maintains that the current emergency was caused by the harsh desert conditions encountered in Operation Iraqi Freedom. Defendant also avers that the J & A was approved in a timely fashion. In addition, defendant contends that the substance of the J & A adequately addresses the need for the filters and the possible harm from any delay in procurement. Defendant also asserts that it was impracticable to seeks offers from other sources given the time constraints and Sikorsky's qualifications. Defendant maintains that authorization for the procurement of 240 IBF kits is based on an estimate of the number of aircraft to be deployed in the next troop rotation and, therefore, does not exceed the minimum amount necessary to satisfy the current emergency. Defendant also maintains that the full amount of funding for

---

29. Consistent with the court's holding concerning the presumption of prejudice, "hard facts" are only required to "establish the existence of the [OCI], [but] not the specific impact of that conflict." *Aetna*, B–254397.15, 95–2 CPD ¶ 129, at 18, 1995 WL 449806, at *12.

30. Plaintiff Filtration Development Company's Motion For Judgment On The Administrative Record (Pl.'s Mot.) at 15.

31. *Id.* at 25 (quoting 10 U.S.C. § 2304(e)).

32. *Id.* (quoting *Matter of: Signals & Sys., Inc.*, B–288107, 2001 CPD ¶ 168, at 12, 2001 WL 1150705, at *9 (Comp.Gen. Sept.21, 2001)).

the IBF kits has not yet become available due to statutory constraints.

CICA requires an agency to conduct its procurements through "full and open competition." 10 U.S.C. § 2304(a)(1)(A). As with most rules, the mandate is not absolute and is subject to several exceptions. Most pertinent to the present controversy is the unusual and compelling urgency exception. *Id.* § 2304(c)(2). Specifically, the exception reads as follows:

> The head of an agency may use procedures other than competitive procedures only when ... (2) the agency's need for the property or services is of such an unusual and compelling urgency that the United States would be seriously injured unless the agency is permitted to limit the number of sources from which it solicits bids or proposals.

*Id.;* 48 C.F.R. § 6.302–2(a)(2). Noticeably, the provision only allows an agency the option of "limit[ing] the number of sources;" it does not permit the agency to simply disregard competition. The preference for optimizing competition is further reiterated in § 2304(e), which provides, in pertinent part, that "[t]he head of an agency using procedures other than competitive procedures ... by reason of the application of subsection (c)(2) ... shall request offers from as many potential sources as is practicable under the circumstances." 10 U.S.C. § 2304(e); 48 C.F.R. §§ 6.301(d), 6.303–2(c)(2); see also *Aero Corp. v. Dep't of the Navy,* 540 F.Supp. 180, 207 (D.D.C.1982). In addition, invocation of the unusual and compelling urgency exception may not be "justified on the basis of (1) a lack of advance planning by the requiring activity or (2) concerns related to the amount of funds available (e.g., funds will expire) to the agency or activity for the acquisition of supplies or services." 48 C.F.R. § 6.301(c); 10 U.S.C. § 2304(f)(5).

Several inherent limitations as to scope and duration have also been acknowledged. The court has recognized that "the agency [must] take reasonable steps to accurately determine its needs and describe them." *Filtration Dev. Co., LLC v. United States,* 59 Fed.Cl. 658, 663–64 (2004) (quoting *Matter of: Signals & Sys., Inc.,* B–288107, 2001 CPD ¶ 168, at 12, 2001 WL 1150705, at *9 (Comp.Gen. Sept.21, 2001)). The court also emphasized that "the urgency justification cannot support the procurement of more than a minimum quantity needed to satisfy the immediate urgent requirement." *Id.* In addition, the Comptroller General has held that invocation of the exception "should not continue for more than a minimum time." *Matter of: Tri–Ex Tower Corp.,* B–239628, 90–2 CPD ¶ 221, at 5, 1990 WL 278490, at *4 (Comp.Gen. Sept.17, 1990).

At the outset, plaintiff indicates in its reply brief that "[n]ever has [plaintiff] questioned that the Army has a need to equip the UH–60 aircraft in Iraq with IBF kits."[33] This concession echoes the representations in plaintiff's amended complaint: "[plaintiff] recognizes that the Army has an urgent need to acquire IBF devices as a result of operations in Iraq ...."[34] While plaintiff pays lip service to its concession, plaintiff nevertheless challenges substantive aspects of the J & A and, in turn, the invocation of the unusual and compelling urgency exception. Plaintiff, however, may not have it both ways. The Federal Circuit has held that "pleadings are judicial admissions and a party may invoke the language of the opponent's pleading to render the facts contained therein indisputable." *E.C. McAfee A/C Bristol Metal Indus. of Canada, Ltd. v. United States,* 832 F.2d 152, 154 n. * (Fed.Cir.1987). The proposition that the justification behind the invocation of the unusual and compelling urgency exception is "the urgent need to acquire IBF devices as a result of operations in Iraq" is indisputable and plaintiff is precluded from now raising any arguments to the contrary.

Assuming *arguendo* that plaintiff's concession somehow does not extend to arguments concerning "lack of advance planning" and "funding concerns," the court rejects those arguments on the merits. Plaintiff main-

---

33. Plaintiff Filtration Development Company's Reply Brief In Support Of Its Motion For Judgment On The Administrative Record (Pl.'s Reply) at 1.

34. Amend. Compl. ¶ 3; see also Tr. at 15–16.

tains that the Army has been aware of the detrimental effects of sand for over a decade. The Army, contrary to plaintiff's suggestions, did take actions to implement a solution. In 1991 and 1995, the Army attempted to develop a filter system, but both attempts were deemed failures.[35] Further, the Army had instituted a trade study in July 2003 to develop an acceptable solution. Accordingly, the Army reasonably sought to address the problem, albeit unsuccessfully, and the court refuses to equate unsuccessful attempts to address a problem as a "lack of advance planning."

In addition, "funding concerns," as contemplated by the FAR, did not drive the invocation of the exception. The J & A states that the Army expended $300 million to remove and replace approximately 400 engines.[36] The Army's October 9, 2003, directive also sought to equip all UH–60 Blackhawk helicopters with the IBF kits beginning in March 2004. That same directive provided that this course of action was necessary to "ensure required readiness in theater." [37] The court would be required to simply disregard this evidence to hold that the Army's decision to procure the IBF kits without full and open competition was based on "funding concerns." The court declines to do so.

Plaintiff argues more forcefully that the Army failed to "request offers from as many potential sources as is practicable under the circumstances." 10 U.S.C. § 2304(e). Defendant counters that the urgent time constraints coupled with Sikorsky's qualifications made it impracticable to seek offers from other sources. Stated another way, defendant avers that its conclusion that Sikorsky was the only source capable of meeting its requirements was reasonable. Defendant maintains that it only selected Sikorsky and, in turn, Sikorsky independently selected AFS. Plaintiff, on the other hand, asserts

that the Army should not be permitted to hide behind its prime contractor.

While the contract modification did not specifically direct Sikorsky to utilize AFS's design, the administrative record in two separate instances provides that Sikorsky was directed to incorporate AFS's design in August 2003.[38] The fact that the contract modification did not expressly reference AFS in December 2003, after Sikorsky had spent at least three months incorporating the AFS design, does little to dispel the notion that the Army selected AFS as the IBF kit provider in August 2003. Defendant's mere subjective satisfaction, however, with either Sikorsky's or AFS's performance or capabilities would not justify an abandonment of CICA's mandate for full and open competition. *Matter of: TeQcom, Inc.*, B–224664, 86–2 CPD ¶ 700, at 5, 1986 WL 64514, at *4 (Comp.Gen. Dec.22, 1986). Rather, the inquiry in this context is slightly more stringent and focuses on whether the Army's conclusion that only Sikorsky or AFS could perform the required work within the abbreviated time period was reasonable.

Plaintiff does not contest Sikorsky's qualifications,[39] and the court turns to the Army's assessment of AFS's qualifications. Defendant attempts to demonstrate the reasonableness of the Army's determination by arguing that on December 15, 2003, the date of Sikorsky's contract modification, AFS and plaintiff were not on equal footing. As was discussed above, defendant's reliance on the contract modification date is again misplaced. The decision concerning whether requesting offers from other sources was practicable, as well as whether competitive alternatives were feasible, should have been made in August 2003.[40] At this point, several observations are warranted. While it is known that a trade study was partially completed, the

---

**35.** AR Ex. E ¶ 1.1(a).

**36.** The court also finds that this monetary justification is sufficient in and of itself to justify the invocation of the exception and to demonstrate harm to the government. 48 C.F.R. § 6.302–2(a)(2) ("delay in award of a contract would result in serious injury, *financial or otherwise,* to the Government." (emphasis added)); see also *id.* § 6.303–2(a)(9)(iii).

**37.** SUP AR 0003.

**38.** AR Ex. A ¶ 3; *Id.* Ex. O at 2.

**39.** Pl.'s Reply Brief at 10.

**40.** See AR Ex. A ¶ 3; see also *id.* Ex. O at 2.

number of participants in that trade study, or any other particulars for that matter, remain a mystery. Plaintiff also advances a colorable claim that if the Army had approached the procurement with the mind-set of achieving limited competition it would have been able to meet the Army's requirements. Defendant, on the other hand, directs the court's attention to portions of the administrative record which characterize plaintiff's design as: (1) "very conceptual (hand sketches) with no real supporting information such as aircraft measurements, models, etc."[41] and (2) "lack[ing] sufficient information and detail in areas [making] feasibility difficult to assess."[42] After careful consideration of the parties' contentions, the court finds that given the ultimate disposition in this case it need not conclusively decide this issue.

On the other hand, the court can conclude that the Army has "[taken] reasonable steps to accurately determine its needs and describe them." *Filtration,* 2004 WL 223988, at *5 (quoting *Matter of: Signals & Sys., Inc.,* B–288107, 2001 CPD ¶ 168, at 12, 2001 WL 1150705, at *9). On October 9, 2003, the Army determined that the filters were to be installed on the helicopters prior to their deployment to Iraq beginning in March 2004 "to ensure required readiness in theater."[43] Although the Army initially estimated that its needs would be satisfied through the procurement of 132 filters, in a series of meetings in October 2003, the Army subsequently revised its estimate to 240.[44] Because each unit has a certain number of UH–60 helicopters assigned to it, the Army arrived at the 240 figure by examining the number of units being deployed to Iraq.[45] Government officials are presumed to act in good faith, *Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d 1234, 1239 (Fed.Cir.2002), and the Army was undoubtedly in the best position to make that assessment. The court, therefore, will not second-guess the Army's estimate. *North Dakota v. United States,* 495 U.S. 423,

443, 110 S.Ct. 1986, 109 L.Ed.2d 420 (1990); *Orloff v. Willoughby,* 345 U.S. 83, 93, 73 S.Ct. 534, 97 L.Ed. 842 (1953); *Voge v. United States,* 844 F.2d 776, 779 (Fed.Cir.1988).

A subtle distinction, however, must be drawn between the Army's overall needs and the needs necessary to satisfy the current emergency. Although some leeway must be factored into the equation, the Army's December 15, 2003, procurement must reflect its immediate emergency need and must be temporally limited. *Filtration,* 2004 WL 223988, at *5; *Tri–Ex,* B–239628, 90–2 CPD ¶ 221, at 5, 1990 WL 278490, at *4. Defendant has allocated funding for 80 "A kits" and 80 "B kits," but defendant seeks to have the procurement ultimately yield 183 "A kits" and 150 "B kits."[46] While plaintiff maintains that the former quantity represents defendant's true needs,[47] defendant was statutorily prohibited from obligating an amount equivalent to the contract price. 10 U.S.C. § 2326(b) (setting a ceiling on the percentage of the contract price that can initially be obligated under an undefinitized contract). Defendant certainly cannot be faulted in this respect. The delivery schedule for the 183 "A kits" and 150 "B kits," without accounting for minimal delays, extends from late March 2004 until July 2004. It does not appear, however, that funding has been allocated in excess of that necessary to procure the 183 "A kits" and 150 "B kits," and consequently, there is no time frame in which those units are to be delivered. Unlike the current obligation of funds which must comply with 10 U.S.C. § 2326, there is no indication as to when the additional funds will be forthcoming. Similarly, a delivery schedule has not been implemented. In light of these uncertainties, the court is unwilling to condone an indefinite extension of the unusual and compelling urgency" exception. Such an endorsement would be inconsistent with the exception's overt and inherent limitations. The court, therefore, holds that the Army

41. *Id.* Ex. A ¶ 4.

42. *Id.* Ex. C ¶ 9(b).

43. *Id.* Ex. C ¶ 10(a); SUP AR 0003.

44. AR Ex. A ¶ 7.

45. Tr. at 47.

46. AR Ex. K.

47. Tr. at 21, 29.

through its actions has revealed that its current emergency situation encompasses only 183 "A kits" and 150 "B kits."

### III. Permanent Injunction

■ To obtain injunctive relief, plaintiff must succeed on the merits and prove that: (1) it will suffer irreparable harm if the injunction is not awarded; (2) granting relief serves the public interest; and (3) the harm it will suffer outweighs the harm to the government and third parties. *Computer Sciences Corp. v. United States*, 51 Fed.Cl. 297, 323 (2002); *United Int'l Investigative Servs., Inc. v. United States*, 41 Fed.Cl. 312, 323 (1998) (citing *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed.Cir.1993)); *ATA Def. Indus., Inc. v. United States*, 38 Fed.Cl. 489, 505 n. 10 (1997) (explaining that the factors for .a permanent injunction are essentially "the same as those considered for a preliminary injunction"). Injunctive relief is an extraordinary remedy and plaintiff must demonstrate its entitlement to such relief by clear and convincing evidence. *CACI*, 719 F.2d at 1581 (noting that the court should only interfere with the procurement process in "extremely limited circumstances"); *Cincom Sys., Inc. v. United States*, 37 Fed.Cl. 266, 268 (1997). No one factor is dispositive, however, a weakness in one factor may be overcome on balance by the strength of others. *FMC Corp.*, 3 F.3d at 427.

■ Plaintiff's request for injunctive relief falls into two categories. The first category of injunctive relief deals with enjoining the procurement of any IBF kits above the number for which funding is currently available, and directing that the procurement of any IBF kits over that number be conducted on a competitive basis. The second category involves future events and procurements. In particular, plaintiff seeks an injunction preventing Westar or any of its affiliates from being awarded a filter contract as long as Westar is providing SETA services, and an injunction prohibiting AFS from participating in the re-instituted trade study.

### A. *Actual Success on the Merits*

Plaintiff has demonstrated actual success on the merits. There is no need in this subsection to expand on the parties' arguments as they merely offer an abbreviated synopsis of their substantive contentions. Defendant, in its procurement of IBF kits, did not adhere to OCI requirements. The CO improperly usurped the authority granted to the chief of the contracting office. Lacking his approval or his signature, the proposed mitigation plans cannot be given binding effect. An actual OCI exists because of Westar's O2K work. Moreover, defendant has exceeded the permissible bounds of the unusual and compelling urgency exception. As evidenced in the J & A, the Army may indeed have concluded that its overall needs encompassed 240 IBF kits. The Army's true emergency needs are discerned from within the procurement; the most recent delivery schedule extends only until July 2004 and the most recent allocation of funds only contemplates the procurement of 183 "A kits" and 150 "B kits." Accordingly, the resolution of this factor weighs in plaintiff's favor.

### B. *Irreparable Harm*

Plaintiff asserts that it has demonstrated irreparable harm because it was not permitted to compete for the IBF kits. Plaintiff also maintains that it was deprived of lost profits. Further, plaintiff contends that its irreparable harm will be compounded because this procurement will provide AFS with an advantage in the procurement for the fully qualified IBF kits. Plaintiff also avers that Westar continues to occupy a highly influential position.

Defendant asserts that plaintiff will not be irreparably harmed because the current procurement is only a temporary solution. Defendant maintains that the IBF kits installed under an airworthiness release will be removed after the completion of military operations and that the engines will be returned to their original configuration. Defendant also contends that plaintiff will be able to participate in the re-instituted trade study and will have an opportunity to compete for the fully qualified IBF system.

The court has held that the opportunity to compete for a contract and to secure any resulting profits generally has been recog-

nized to constitute significant harm. *United Int'l*, 41 Fed.Cl. at 323. This court has also given credence to an argument based on the awardee gaining a competitive advantage in a future procurement. *ATA*, 38 Fed.Cl. at 505 (considering any advantage the awardee of the current contract would have in future upgrade procurements). Although the concern that AFS would derive a competitive advantage is slightly mitigated by the fact that the current procurement is temporary in nature and only requires an airworthiness certification, defendant has already acknowledged that the two companies are no longer on equal footing. The second factor, therefore, likewise tilts in plaintiff's favor.[48]

### C. *Balance of Harm & Public Interest*

The public interest factor, not surprisingly, was the most heavily contested by the parties. Plaintiff asserts that the public has an interest in ensuring that government procurements are conducted in an open and fair fashion. Plaintiff also maintains that the public has an interest in "minimizing the costs of federal procurements." [49] Further, plaintiff avers that defendant's national security and national defense arguments should properly be characterized as concerns about maintenance and repair costs. In the alternative, plaintiff then espouses a "sliding scale" national defense argument. Plaintiff argues that any national defense concerns are eviscerated after the first 80 "A kits" and 80 "B kits" are delivered. Plaintiff also asserts that, in the event the court refuses to enjoin any portion of the current procurement, national defense concerns would not affect future IBF kit acquisitions.

Defendant maintains that the procurement was conducted fairly and in accordance with statutory and regulatory provisions. Defendant also avers that the cost of competition

as well as the cost associated with any delay would dramatically increase the cost of the procurement. Lastly, but most importantly, defendant contends that an injunction would have an adverse impact on national defense. In particular, defendant avers that an injunction would result in delay and disruption as well as compromise military performance and readiness.

The Tucker Act instructs the court to "give due regard to the interests of national defense and national security" when considering bid protests. 28 U.S.C. § 1491(b)(3). The court proceeds well aware that it "must give serious consideration to national defense concerns and arguably should err on the side of caution when such vital interests are at stake, [but that] allegations involving national security must be evaluated with the same analytical rigor as other allegations of potential harm to parties or to the public." *ATA*, 38 Fed.Cl. at 506.

The record contains evidence that the driving force behind the procurement was both national defense needs and financial concerns. In the brief period since operations in Iraq began, the Army has expended approximately $300 million to remove and replace 400 engines.[50] In a letter to plaintiff dated November 13, 2003, the Army indicated that it "is no longer able to keep up with the demand" of providing replacement engines.[51] That letter also explained that "[t]he lack of replacement engines threatens availability of aircraft to support current overseas operations." [52] Although the court would hesitate to hinge its decision entirely on a letter to plaintiff's counsel, it does not encounter this concern today. In the October 9, 2003, directive, the Army concluded installation of IBF kits "was required for ... deployment not later than [March 2004] *to ensure re-*

---

**48.** At oral argument, it was brought to the court's attention that plaintiff was only interested in providing "B kits." *Id.* at 43. Although the court sought clarification on this point, plaintiff's counsel could only assure the court of his "underst[anding]" that plaintiff would provide both the "A kits" and the "B kits." *Id.* at 53.

**49.** Plaintiff Filtration Development Company's Opposition To Defendant's Cross–Motion For

Judgment On The Administrative Record at 16 (citing *Vanguard Sec. Inc. v. United States*, 20 Cl.Ct. 90, 113 (1990)).

**50.** AR Ex. C ¶ 5(d).

**51.** *Id.* Ex. O at 1.

**52.** *Id.*

*quired readiness in theater.*" [53] Further, the J & A provided that the IBF kits were necessary to "meet the urgent need for kits *to support the war effort* . . . ." [54] The court finds no appropriate or legitimate basis to challenge these conclusions. *North Dakota,* 495 U.S. at 443, 110 S.Ct. 1986 ("When the Court is confronted with questions relating to . . . military operations, we properly defer to the judgment of those who must lead our Armed Forces in battle."); *Orloff,* 345 U.S. at 93, 73 S.Ct. 534 ("[J]udges are not given the task of running the Army."); *Voge,* 844 F.2d at 779 ("Judicial deference must be 'at its apogee' in matters pertaining to the military and national defense.").

The recognition that the IBF kits are necessary to ensure combat readiness does not stem solely from defendant's correspondence, an Army directive, and the J & A. Prior to this suit being filed, plaintiff acknowledged that "[a]side from the obvious advantages, it would seem also prudent for the the [sic] Government to evaluate several alternative solutions (such as FDC's design), *considering the fact that the overall design is critical to flight performance, mission safety/reliability, maintainability, and costs.*" [55] In this regard, it appears disingenuous for plaintiff to argue that the IBF kits are necessary to "flight performance" and "mission safety/reliability" when it seeks to provide them, but that these concerns suddenly disappear when the Army seeks to acquire them.

Plaintiff attempts to analogize its situation to cases which plaintiff asserts lacked " 'true' national security considerations." [56] Plaintiff's argument, however, is unconvincing. Plaintiff's characterization of those cases as lacking " 'true' national security considerations" understates the reasoning in those cases. Noticeably absent from *Irvin* and *Informatics* was any analysis whatsoever regarding national defense. *Irvin Indus. Canada, Ltd. v. United States Air Force,* 924 F.2d 1068 (D.C.Cir.1990) (enjoining a contract for parachute rip cord releases without any analysis as to national security or national defense considerations); *Informatics Corp.*

*v. United States,* 40 Fed.Cl. 508 (1998) (analyzing the public interest factor solely on minimizing the cost to government and without reference to either national security or national defense). And, the plaintiff in *Scopus* only "generally" argued that the M17 tank periscopes were a "critical defense item" without any argument that "setting aside the contract would jeopardize any national defense." *Scopus Optical Indus. v. Stone,* 1990 WL 95518, at *6 (D.D.C.1990). In addition, none of the plaintiffs in *Informatics, Irvin,* or *Scopus* argued that the items procured would immediately be deployed to or used in an actual conflict/hostility area. It is no wonder then that the courts in those cases did not hesitate to invalidate or enjoin the procurements.

On the other hand, plaintiff fails to provide a substantive basis on which to distinguish bid protest decisions where genuine national defense considerations have been raised. In *CSE,* this court refused to issue an injunction where the Army argued that upgrading two firing ranges in Missouri was critical to training soldiers under modern standards. *CSE Constr. Co., Inc. v. United States,* 58 Fed.Cl. 230, 263 (2003). Similarly, in *Al Ghanim,* this court refused to issue an injunction for housing quarters which were to be constructed in Kuwait in support of Operation Iraqi Freedom. *Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States,* 56 Fed.Cl. 502, 521–22 (2003). In *Gentex,* this court refused to grant an injunction preventing the procurement of aircrew masks which would protect against chemical or biological warfare. *Gentex Corp. v. United States,* 58 Fed.Cl. 634, 655–56 (2003). Likewise, in *Cincom,* the court declined to issue an injunction preventing the United States Department of Defense (DOD) from procuring software for reparables management at DOD maintenance depots. *Cincom,* 37 Fed. Cl. at 269. Specifically, the court reasoned, taking national defense interests into account, that the software would help ensure that the armed forces will have the capability

---

**53.** SUP AR 0003 (emphasis added).

**54.** AR Ex. C ¶ 9(b) (emphasis added).

**55.** SUP AR 0034 (emphasis added).

**56.** Pl.'s Mot. at 38.

to efficiently maintain weapons and equipment in good working order. *Id.*

The case before the court likewise raises national defense considerations which lead to the same conclusion. At this juncture, it is important to keep in mind that plaintiff must show its entitlement to the extraordinary remedy of injunctive relief by clear and convincing evidence. *CACI,* 719 F.2d at 1581; *Cincom,* 37 Fed.Cl. at 268. Putting aside both the Army directive as well as the J & A, and assuming that an overlap between monetary and national defense concerns exists, the court cannot simply disregard the national defense implications. The UH–60 Blackhawk helicopter serves many purposes in supporting the military's operations in Iraq. It is the primary helicopter employed for transporting troops, and it is also used to evacuate injured personnel as well as transport supplies.[57] It is undisputed that the harsh desert conditions in that region caused significant damage to its engines and engine components. As a result, a large number of engines have been replaced at an enormous cost. Due to the sheer volume of replacements, the Army is unable to keep up with the demand.

The obvious and unavoidable conclusion which follows from these facts is that a failure to immediately meet the demand would jeopardize the helicopters availability to provide critical support to Army operations. The Army should not be placed in a compromising position that would require it to operate the helicopters with deteriorated and corroded replacement engines that have been subjected to the abusive wear and tear of desert terrain. The Army is unquestionably entitled to the means to operate its combat zone helicopters at peak performance levels. Upon reviewing the arguments that plaintiff proffers to support its position against this backdrop, and "giv[ing] due regard to the interests of national defense," the court holds that this factor weighs heavily in defendant's favor; so much so, it conclusively tilts the scale against granting permanent injunctive relief for the 183 "A kits" and 150 "B kits"

for which funding has been allocated and a delivery schedule has been set.

The court, however, reaches a contrary conclusion with respect to any kits in excess of 183 "A kits" and 150 "B kits." From the record, it is unascertainable whether and when funding for the additional kits will be available and when the kits would be delivered. Defendant represented at oral argument that the cost of procuring 183 "A kits" and 150 "B kits" has decreased to approximately $30 million.[58] It is, therefore, possible that 240 IBF kits could be procured under the original $40.8 million allocation of funds. On the other hand, defendant has admitted that no delivery schedule is in place beyond July 2004.[59] In addition, there is no indication that Sikorsky's contract with the Army has been altered to reflect the production and delivery of additional IBF kits.

Defendant should not be permitted to extend the current emergency indefinitely. More than half a year has passed since Sikorsky was directed to incorporate AFS's design. It is unclear if any additional steps, besides representations that a trade study for fully qualified IBF kits will be conducted, have been taken to promote competition. The court will take the opportunity to endorse, and ensure compliance with the proposition that "[c]ontracting officials must act affirmatively to obtain and safeguard competition; they cannot take a passive approach and remain in a noncompetitive position where they could reasonably take steps to enhance competition." *Matter of: Signals & Sys., Inc.,* B–288107, 2001 CPD ¶ 168, at 12, 2001 WL 1150705, at *11. The Army has had since May 2003, when discussions with AFS first took place, and will have until at least July 2004, the time period in which the 183 "A kits" and 150 "B kits" will be produced and delivered, to enhance competition for additional IBF kits. The court holds that national defense considerations in this case cannot justify an indefinite extension of the unusual and compelling urgency exception and, therefore, enjoins the Army from procuring under the current J & A any quantity

---

**57.** Tr. at 44.

**58.** *Id.* at 37.

**59.** *Id.* at 40.

in excess of the 183 "A kits" and 150 "B kits."

Lastly, the court declines to enter a permanent injunction precluding AFS from future competition for engine filters. Defendant argues that the court's review in bid protest cases is limited to applying the APA standard of review to the administrative record. Defendant, however, overlooks the fact that the basis for the future injunction would be a finding that the current procurement created an OCI on a future acquisition. The FAR expressly contemplates such review and indicates that "some restrictions on future activities of the contractor may be required." 48 C.F.R. § 9.502(c). Nevertheless, this is not the only provision in the FAR which guides the resolution of the issue. The FAR provides the following instruction: "[e]ach individual contracting situation should be examined on the basis of its particular facts and the nature of the proposed contract." *Id.* § 9.505. Further, the FAR permits the CO, after finding that it is in the best interest of the United States to do so, to award the contract despite the OCI upon obtaining a waiver from the head of the agency or a designee. *Id.* §§ 9.503, 9.504(e). Given that the court can envision a situation where such an option could be exercised, a permanent injunction excluding AFS from the re-instituted trade study and from future competition is inappropriate.

### Conclusion

For the above-stated reasons, plaintiff has shown that the Army violated OCI regulations and exceeded the permissible bounds of 10 U.S.C. § 2304(c)(2). In light of plaintiff's burden of demonstrating its entitlement to the extraordinary remedy of permanent injunctive relief by clear and convincing evidence, and after "giv[ing] due regard to the interests of national defense and national security" as required by 28 U.S.C. § 1491(b)(3), the following is hereby ordered:

1) Defendant is entitled to procure 183 "A kits" and 150 "B kits" under its current invocation of the unusual and compelling urgency exception;

2) Any procurement in excess of 183 "A kits" and 150 "B kits" must be conducted on a competitive basis unless an independent justification for invoking an exception to full and open competition is provided;

3) AFS will not be enjoined from participating in the re-instituted trade study or from participating in future competition.

The parties' cross-motions for judgment on the administrative record are GRANTED to the extent stated above, and otherwise DENIED. The Clerk of the Court is hereby directed to enter judgment in accordance with this opinion.

The parties shall notify the court by Monday, April 26, 2004, of any portion of the opinion containing proprietary information, national defense or national security concerns, or classified information, that should be redacted prior to publication. The parties shall also file with the court any proposed entitlement to costs by said date.

IT IS SO ORDERED.